# STEARNS *v.* MINNESOTA.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 20.   Argued October 16, 17, 1900. — Decided December 3, 1900.

The constitution of Minnesota of 1858, still in force, provided that all taxes
should be as nearly equal as may be, and that the property taxed should be
equalized and uniform throughout the State.   It made provision for cer-
tain defined exemptions, and provided for uniform and equal taxation
throughout the State.   Before that time, namely, on September 28, 1850,
Congress had granted to the several States, Minnesota included, the
swamped and overflowed lands within each; and other grants were subse-
quently made, as stated in the opinion of the court, subject to be taxed
only as the land should be sold.   There were also statutes passed in re-
gard to the taxation of land granted to the Lake Superior and Pacific
Railroad Company, which are set forth in the opinion of the court.   In
1896 an act was passed, repealing all former laws exempting from taxa-
tion, and providing for the taxation of the lands granted to railroads as
other lands were assessed and taxed.   *Held,* that, in this legislation a
valid contract was created, providing for the taxation of all railroad prop-
erty (lands included) on the basis of a per cent of the gross earnings,
which contract was impaired by the legislation of 1896, withdrawing the
lands from the arrangement, and directing their taxation according to
their actual cash value; that as to the St. Paul & Duluth Railroad Com-
pany a contract was made, and only Congress can inquire into the manner
in which the State executed the trust thereby created and disposed of the
lands; and that, as to the Northern Pacific Company, the legislation
changed materially the terms of the contract between the State and that
company.

THIS case comes on error to the Supreme Court of the State
of Minnesota, is brought here at the instance of certain railroad
companies, and involves the question whether the real estate
belonging to them, and not used in the operation of their roads,
is subject to taxation according to its value, or is excepted from
such ordinary rule of taxation by virtue of a contract alleged to
have been made many years ago by legislation of the State, to
the effect that railroad companies should pay a certain per cent
on their gross earnings in lieu of taxes on all their property.

The facts are as follows, and first as to lands belonging to the
St. Paul and Duluth Company :

The constitution of Minnesota, adopted in 1858, has always contained these provisions (Article IX, sections 1 and 3):

" SEC. 1. All taxes to be raised in this State shall be as nearly equal as may be, and all property on which taxes are to be levied shall have a cash valuation, and be equalized and uniform throughout the State."

" SEC. 3. Laws shall be passed taxing all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise, and also all real and personal property according to its true value in money; but public burying grounds, public school houses, public hospitals, academies, colleges, universities, and all seminaries of learning, all churches, church property used for religious purposes, and houses of worship, institutions of purely public charity, public property used exclusively for any public purpose, and personal property to an amount not exceeding in value two hundred dollars for each individual, shall, by general laws, be exempt from taxation."

On May 23, 1857, by the territorial legislature of Minnesota, the Nebraska and Lake Superior Railroad Company was organized. Laws, Minn. 1857, c. 93, p. 323. By an act of the state legislature, of date March 8, 1861, the name of this company was changed to the Lake Superior and Mississippi Railroad Company. Laws, Minn. 1861, p. 201. By this act certain of the swamp lands granted to the State by the act of Congress of September 28, 1850, 9 Stat. 519, were granted to that company to aid in the construction of its railroad. The St. Paul and Duluth Company is the successor in interest of that company, and has succeeded to all its rights, privileges, immunities and property. By act of Congress of date May 5, 1864, 13 Stat. 64, as amended July 13, 1866, 14 Stat. 93, lands were granted to the State of Minnesota to aid in building a railroad from the city of St. Paul to the head of Lake Superior. The first section declaring the grant reads: " That there be, and there is hereby, granted to the State of Minnesota for the purpose of aiding in the construction of a railroad in such State from the city of St. Paul to the head of Lake Superior, every alternate section of public land," etc. Section 5 reads:

" That the said lands hereby granted when patented to said

State, shall be subject to the disposal of said State for the purposes aforesaid, and for no other; and the said railroad shall be and remain a public highway for the use of the Government of the United States, free from all toll or other charge, for the transportation of any property or troops of the United States."

On February 23, 1865, the legislature of Minnesota passed an act accepting the grant, and transferring the lands to the predecessor of the St. Paul and Duluth Railroad Company. Special Laws, Minn. 1865, c. 2, p. 19. The first section, after accepting the lands granted, reads:

" And the same are hereby granted, vested in, and transferred to the Lake Superior and Mississippi Railroad Company, its successors and assigns, to be held, used or sold and disposed of by said railroad company, to aid in the construction of a railroad, as contemplated and provided by said act of Congress, and for the equipment and operation of the same, and for no other purpose whatever, the same to be held, used, and disposed of upon and subject to the conditions in said act of Congress provided, and upon the conditions in this act contained. That in consideration of lands granted by this act, and of the lands, rights, privileges and franchises which have heretofore been granted to said railroad company, the said company shall, on or before the first day of March of each and every year after said railroad is completed and in operation, pay into the treasury of the State three per cent on the gross earnings of said railroad, which sum shall be in lieu and in full of all taxation and assessments upon the said railroad, its appurtenances and appendages, and all other property of said company, real, personal and mixed, including the lands hereby and heretofore granted to said company, or so intended to be granted. Provided, however, that the lands hereby and heretofore granted to said company shall be subject to like lands of individuals, to be taxed as fast as the same are sold or conveyed, or contracted to be sold, or are leased by said company, or the stumpage upon any lands is sold or contracted to be sold by said company; but no mortgage or trust deed executed by said company upon said lands shall, for the purpose of taxation, be construed as such sale, conveyance, lease or contract of sale."

Eight days thereafter, and on March 3, 1865, an act amendatory of this act was passed. Special Laws, 1865, c. 8, p. 45. The first section of this act is as follows:

" 1. That whenever any lands heretofore or hereafter granted to the Lake Superior and Mississippi Railroad Company to aid in the construction or completion of its road or branches shall be contracted to be sold, conveyed or leased by said company, the same shall be placed upon the tax list by the proper officer for taxation as other real estate for the year succeeding that in which such contract for a sale, conveyance or lease thereof shall have been made, but in enforcing a collection of the taxes thereon, the title or interest of the said company or of any trustee or mortgagee thereof shall be in nowise impaired or affected thereby, but the improvements thereon and all the interest of the purchaser or lessee therein may and shall in case of default in the payment of taxes upon such land, be sold to satisfy the same, and it shall be the duty of the proper officers to assess and collect such taxes in accordance with the general laws relating to the assessment and collection of taxes, and that the provisions of the several acts in relation to the taxation of the lands of said company, so far as the mode of taxing such lands conflict with the provisions of this act, shall be and they are repealed. ˙Provided, that said company shall, during the first three years after thirty miles of said railroad shall be completed and in operation, on or before the first day of March in each and every year, pay into the treasury of the State one per cent on the gross earnings of said railroad, the first payment to be made on the first day of March next after thirty miles of said railroad shall be completed and in operation, and shall, during the seven years next ensuing after the expiration of the three years aforesaid, pay into the treasury of this State, on or before the first day of March of each and every year, two per cent of the gross earnings of said railroad, and shall, from and after the expiration of said seven years, on or before the first day of March of each and every year, pay into the treasury of this State three per cent of the gross earnings of said railroad ; and the payment of such per centum annually, as aforesaid, shall be and is in full of all taxation and assessment whatever."

The second section provided for acceptance of the provisions of the act by the railroad company; that when accepted "the same shall become obligatory upon the State and upon said company;" and they were accepted. Thereafter, as admitted, the railroad was constructed by the company "in reliance upon said act." Taxes were paid by the railroad company on its property in accordance with the terms of this alleged contract until 1895, and during those years the State made no attempt to levy any taxes upon these lands. In 1871 the following amendment to the state constitution was by vote of the people duly adopted (Laws, Minn. 1871, p. 41):

"Any law providing for the repeal or amendment of any law or laws heretofore or hereafter enacted, which provides that any railroad company now existing in this State or operating its road therein, or which may be hereafter organized, shall in lieu of all other taxes and assessments upon their real estate, roads, rolling stock and other personal property at and during the time and periods therein specified, pay into the treasury of this State a certain per centum therein mentioned of the gross earnings of such railroad companies now existing, or hereafter organized, shall, before the same shall take effect or be in force, be submitted to a vote of the people of the State, and be adopted and ratified by a majority of the electors of the State voting at the election at which the same shall be submitted to them."

In November, 1896, this statute passed in 1895, Laws, 1895, p. 378, was adopted by the people:

" Sec. 1. All lands in this State heretofore or hereafter granted by the State of Minnesota or the United States or the Territory of Minnesota to any railroad company shall be assessed and taxed as other lands are taxed in this State, except such parts of said lands as are held, used or occupied for right of way, gravel pits, side tracks, depots and all buildings and structures which are necessarily used in the actual management and operation of the railroads of said companies. Provided, that said railroad companies shall continue to pay taxes into the state treasury upon their gross earnings in the same manner and in the same amount as is now provided by law, and that nothing

in this act contained shall be construed to repeal said laws, except in so far as the same relate to the tax upon said lands.

"SEC. 2. Such portion or portions of any act or acts, general or special, of the State or Territory of Minnesota heretofore enacted which provides or attempts to provide for any exemption of lands hereby declared taxable, from taxation, or for any other method of taxing said last mentioned lands different from the method of taxing other lands in this State, or which are in any manner inconsistent with the provisions of this act, are hereby repealed.

"SEC. 3. If this act shall be held to be void, so far as it applies to the land of any particular railroad company in this State, it shall not be ground for declaring it void or inapplicable to any other company not similarly situated."

Under these provisions the State proceeded to levy taxes upon the lands of the St. Paul and Duluth Company, and the validity of such taxation is the question involved.

Lands belonging to the Northern Pacific Railway Company are also involved in this litigation, and the facts in reference to those lands are these: On July 2, 1864, the Northern Pacific Railroad Company was chartered by an act of Congress to build a railroad from Lake Superior to the Pacific, and received a grant of public lands to aid in the construction thereof. The lands thus granted are those in respect to which the question of taxability arises. 13 Stat. 365. By section 17 of that act the company was authorized to accept "any grant, donation, loan, power, franchise, aid or assistance which may be granted to or conferred upon said company by the Congress of the United States, or by the legislature of any State, or by any corporation, person or persons; and said corporation is authorized to hold and enjoy any such grant, donation, loan, power, franchise, aid or assistance, to its own use, for the purpose aforesaid."

By section 18 it was required to obtain the consent of the legislature of any State through which, in the operation of its road, it might pass previous to commencing work. Such consent was obtained from Minnesota by an act of the legislature of that State, approved March 2, 1865. Laws, 1865, p. 48. On March 4, 1870, the legislature of Minnesota passed an act,

(Special Laws, Minn. 1870, p. 338,) the first and second sections of which are as follows:

"Sec. 1. That the lands, franchises, property, stock and capital of the Northern Pacific Railroad Company shall be liable to assessment and taxation at the same rate and in the same manner, and not otherwise, and shall be exempt from assessment and taxation to the same extent and upon the same terms and conditions as the lands, property and franchises of the Lake Superior and Mississippi Railroad Company, as is provided in and by an act entitled 'An act in relation to the taxation of lands granted to the Lake Superior and Mississippi Railroad Company,' approved March third, eighteen hundred and sixty-five. Provided, however, That the gross earnings of said railroad company on which a percentage is to be paid to the State shall include only the earnings of that portion of the Northern Pacific Railroad constructed and operated by said company within the limits of this State.

"Sec. 2. That said Northern Pacific Railroad Company shall have the right and authority to acquire and hold lands for right of way, depot grounds and for all necessary purposes of said company in all respects as provided by the general laws of this State, as set forth in sections numbered consecutively thirteen to twenty-seven, inclusive, of chapter thirty-four, title one, of General Statutes now in force. But where said company proceeds to condemn private property in more than one county in the same proceedings, the commissioners to be appointed shall be residents of the county where the property to be taken is situated, or of the county to which such county is attached for judicial purposes. And there is hereby granted to the Northern Pacific Railroad Company the right of way through and over any lands of this State to the same extent as is granted by act of Congress through and over the public lands to said company."

This act was duly accepted by the Northern Pacific Railroad Company. Thereafter its road was constructed, and up to the act of 1895, *supra,* taxes were levied and paid in the manner prescribed. The validity of taxes levied upon the lands of this company since the act of 1895, and under the authority of that

act, is challenged, and becomes in this litigation one of the questions involved.

Lands belonging to the Great Northern Railway Company were also involved in the litigation in the state courts, but that company is not here making any contention for a reversal of the judgment of the state Supreme Court.

After the act of 1895, approved by the vote of the people, proceedings were instituted to enforce the levy of taxes on the lands of these railroad companies, and the proceedings thus instituted are those which are now before us. The decision of the Supreme Court of the State was adverse to the railroad companies, (72 Minnesota, 200,) and the case is here on error to that judgment.

*Mr. C. W. Bunn* and *Mr. William B. Hornblower* for plaintiffs in error. *Mr. Julien T. Davies* and *Mr. Emerson Hadley* were on Mr. Hornblower's brief.

*Mr. H. W. Childs* and *Mr. W. B. Douglas* for defendant in error. *Mr. A. Y. Merrill* was on their brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The Supreme Court of Minnesota held that the contract alleged to have been made with the railroad companies for a per cent of the gross receipts in lieu of all taxation upon their property was, in view of the provisions of sections 1 and 3 of article 9 of the state constitution, one beyond the power of the legislature to make. We quote from its opinion :

"The language of the constitution is clear, exact and imperative. It requires that all property not exempt must be taxed, and that the basis of such taxation must be the cash value of the property.

\*       \*       \*       \*       \*       \*       \*       \*

"It may be true, as claimed, that a gross earnings tax (if subject to amendment) is only another mode of arriving at equal taxation, and that such a system of commuted taxation of the

property of railway companies and similar corporations is of great practical and material advantage to the State; but the fact remains that the taxation of all property upon the basis of its cash value was the sole rule ordained by the constitution to secure equality and uniformity of taxation.

\* \* \* \* \* \* \* \*

"We hold that the statutes under which it is claimed that the lands in question are exempt from taxation in the ordinary way, upon the basis of their cash valuation, were unconstitutional when enacted, and remained so until validated by the constitutional amendment of 1871. The legal effect of such amendment was to validate them. *State* v. *Luther*, 56 Minnesota, 156.

"But this ratification or validation of the statutes was a qualified one, and the right to repeal or amend them was reserved by necessary implication, provided such repeal or amendment was adopted and ratified by a majority of the electors.

"Our conclusion is that Laws, 1895, chapter 168, does not impair the obligation of any contract between the State and railway companies, and that the lands here in question are taxable in the ordinary way, as other lands are taxable."

The Federal question thus suggested is the single one for consideration. Was there a valid contract created by the legislation providing for the taxation of all railroad property (lands included) on the basis of a per cent of the gross earnings, which was impaired by the legislation of 1895, withdrawing the lands from this arrangement, and directing their taxation according to their actual cash value? And, first, as to the St. Paul and Duluth Company : That a contract was attempted to be made is obvious. The State, as trustee, held certain swamp and railroad lands. It proposed to give them to the company, subject to taxation in a certain way, if the company would construct the railroad. The company accepted the proposition and constructed the road. Thus, if the parties were competent to enter into such an arrangement, a contract was made. While some of the lands, the swamp lands, were granted to the State for a purpose other than railroad construction, they were granted in trust, and it has long since been settled that Congress alone

can inquire into the manner in which the State executed that trust and disposed of the lands. *Emigrant Co.* v. *County of Adams,* 100 U. S. 61, 69.

With respect to the Northern Pacific Railroad Company, the facts are slightly different, but the state legislation in respect to it was of a character to place its land grant in the same condition, so far as the question of contract is concerned. For the land grant to the company became operative within the limits of a State only when such State consented to the construction of the road. The power to consent carried with it the power to determine the conditions upon which such consent should be granted, and when the State of Minnesota said that the Northern Pacific Railroad Company might construct its road through the State, and might accept the provisions of the congressional grant, and prescribed the conditions upon which such road should be constructed and such grant should be taken, the effect of such legislation is the same as though the State received the grant and transferred it to the company on those conditions. It said in substance that, though the land was not given to the State to be transferred to a railroad company, (and in that case the State might have prescribed the conditions of the transfer,) it was given to the company subject to the assent of the State, and the State's assent to the gift was upon the conditions it named. The offer thus made by the State was accepted, and in reliance thereon the road was constructed.

Of course, withdrawing any portion of the property protected by the three per cent commutation, and subjecting that to ordinary taxation, leaving the three per cent still due from the railroad companies, changes materially the terms of the alleged contract, so that there can be no question that if there were a valid contract created by the earlier legislation, the act of 1895 impairs its obligation. The general rule of this court is to accept the construction of a state constitution placed by the state Supreme Court as conclusive. One exception which has been constantly recognized is when the question of contract is presented. This court has always held that the competency of a State, through its legislation, to make an alleged contract, and the meaning and validity of such contract, were matters which

in discharging its duty under the Federal Constitution it must determine for itself; and while the leaning is towards the interpretation placed by the state court, such leaning cannot relieve us from the duty of an independent judgment upon the question of contract or no contract.

In *Douglas* v. *Kentucky*, 168 U. S. 488, this question was considered at length, and, by Mr. Justice Harlan, after a review of some prior cases, the conclusion was thus stated (p. 502):

" The doctrine that this court possesses paramount authority when reviewing the final judgment of a state court upholding a state enactment alleged to be in violation of the contract clause of the Constitution, to determine for itself the existence or non-existence of the contract set up, and whether its obligation has been impaired by the state enactment, has been affirmed in numerous other cases. *Ohio Life Ins. Co.* v. *Debolt*, 16 How. 416, 452; *Wright* v. *Nagle*, 101 U. S. 791, 794; *Louisville Gas Co.* v. *Citizens' Gas Co.*, 115 U. S. 683, 697; *Vicksburg, Shreveport &c. Railroad* v. *Dennis*, 116 U. S. 665, 667; *N. O. Waterworks Co.* v. *Louisiana Sugar Co.*, 125 U. S. 18, 36; *Bryan* v. *Board of Education*, 151 U. S. 639, 650; *Mobile & Ohio Railroad* v. *Tennessee*, 153 U. S. 486, 493; *Bacon* v. *Texas*, 163 U. S. 207, 219."

See also *McCullough* v. *Virginia*, 172 U. S. 102, 109; *Walsh* v. *Columbus, Hocking Valley & Athens Railroad Company*, 176 U. S. 469.

As a preliminary matter, it is worthy of note that the alleged invalidity of this contract, in respect to taxation, was not complained of for thirty years. Whether the revenues of the State were benefited or injured by this method of taxation we are not advised, but it does appear that neither party challenged it. Both the railroads and the State accepted and acted under it for nearly a third of a century. It may be well to notice the decisions of the Supreme Court of Minnesota prior to the one challenged in this proceeding. In *Railroad Company* v. *Parcher*, 14 Minnesota, 224, it appeared that a railroad charter had been granted by the territorial legislature, containing, among other things, a provision similar to the one in question, commuting all taxes on the basis of three per cent on the gross earn-

ings. The company having defaulted in its contract, foreclosure proceedings were had, and its property, franchises, etc., were bought in by the State. All this was done in pursuance of express statutory provisions. Thereafter an act was passed transferring to a new corporation all the property, franchises, etc., acquired by this foreclosure, and the question presented was whether this new company was entitled to the three per cent commutation. And it was held that it was. The opinion of the court was, that "by the foreclosure proceedings, the State acquired, without any merger, all the franchises and privileges held by the territorial corporation, and that it could transfer them to a new corporation of its own creation. We do not stop to question the argument of the Supreme Court to the effect that there was no merger. All that we deem necessary to notice is that the State by the foreclosure proceedings acquired title to property—railroad property, including lands granted to aid in construction—and, having that property," "could dispose of it free from any limitations imposed by the constitutional provisions which are now referred to as invalidating the present alleged contract. In other words, the State could take and dispose of lands upon precisely the same terms" upon which it took and disposed of the lands to the present plaintiffs in error.

This decision was recognized and reaffirmed in *St. Paul* v. *Railroad Company*, 23 Minnesota, 469, 475, in which it was said :

"Upon the renewal of the grant, in 1864, to the present company, it was therefore clearly competent for the legislature to change and modify its terms and conditions, so as to require the annual payment of a different rate per cent of the gross earnings of the road, to commence upon the completion of thirty instead of fifty miles, and, in consideration of such annual payment, to exempt the railroad, its appurtenances, and other property, from all taxation, and from all assessments, both general and local. This modification of the original contract was prohibited by no provision of the constitution; and the enactment of March 4, 1864, in this regard, has not only been uniformly recognized and acted upon ever since, as valid, by both the executive and legislative departments of the state government, but, by an express consti-

tutional amendment, adopted in 1871, it has been placed beyond the reach of any amendment or repeal, except by a law ratified by a vote of the electors of the State."

See also *County of Stevens* v. *Railway Company*, 36 Minnesota, 467, 470, in which is this declaration:

"That the exemption from ordinary taxation, created in 1857 in favor of the Minnesota and Pacific Railroad Company, subsequently passed with the lands, and as a right appendant thereto, to the St. Paul and Pacific Railroad Company and to the First Division of the St. Paul and Pacific Railroad Company, may be now accepted without question. It was so decided eighteen years ago in the case of the last-named company v. *Parcher*, 14 Minn. 224, 297, which decision has been ever since followed. *State* v. *Winona & St. Peter R. R. Co.*, 21 Minn. 315; *Minnesota Central Ry. Co.* v. *Melvin*, id. 339; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Pfaender*, 23 Minn. 217; *City of St. Paul* v. *St. Paul & Sioux City R. R. Co.*, id. 475; *County of Nobles* v. *Sioux City & St. Paul R. R. Co.*, 26 Minn. 394; *State* v. *Northern Pacific R. R. Co.*, 32 Minn. 294."

And also *State* v. *Luther*, 56 Minnesota, 156, 162, 163, 164, decided 1894, in which the court said:

"The system of providing for the payment of a percentage of the gross earnings of the road in lieu of all other taxes on ' railroad property ' and on the lands granted to aid in its construction, while owned by the company, was inaugurated by the territorial legislatures, and was universally in vogue at the date of the adoption of the constitution.

"And after that date the state legislatures invariably assumed that they continued to possess the power to adopt this system of commuted taxation when granting lands to aid in the construction of a railroad, whether such lands were the absolute property of the State, or were held by it in trust for that purpose under an act of Congress. This was the practice, not only as to old grants made before the adoption of the constitution, but also as to new grants, both state and congressional, made after that date."

And then, after referring to a number of grants by Congress and the State, added:

"In brief, the legislature assumed that when making a grant of lands to aid the building of a railway, or in executing the trust where lands had been granted to the State by Congress for the same purpose, (and which, while thus held by the State, either as proprietor or in trust, were, of course, not subject to taxation,) it had the power, in the furtherance of the object for which the grant was made, to exempt such lands from ordinary taxation, and to provide for commuted taxation of both the railroad and the granted lands.

"There is not in the history of the State a single grant of lands to aid in the building of a railway, where this system of commuted taxation has not been adopted, and we have not found an instance, prior to the adoption of the constitutional amendment of 1871, (Const. Art. 4, sec. 32*a*,) where a commuted system of taxation was provided that did not apply to a land grant as well as to the railroad property. This amounted to a legislative construction of the constitution, which of itself would be entitled to great weight."

It would seem from these decisions to have been the settled law of the State that it could, after the adoption of the constitution of 1858, acquire title to lands and dispose of them subject to the same conditions under which the lands in controversy were granted to the plaintiffs in error.

In *McHenry* v. *Alford*, 168 U. S. 651, legislation of the Territory of Dakota, providing for the taxation of the lands of the Northern Pacific Railroad Company on the basis of a percentage of the gross earnings of the railroad company, was held not in conflict with the mandate in the organic act that no law "shall be passed impairing the rights of private property; nor shall any discrimination be made in taxing different kinds of property; but all property subject to taxation shall be in proportion to the value of the property taxed." While the language of this organic act is not the same as that of the Minnesota constitution, in that the Minnesota constitution by implication requires the taxation of all property except that by its terms specifically exempted, and this act makes no provision in respect to the matter of exemption; yet in respect to property subject to taxation it, like the Minnesota constitution, requires taxation

in proportion to the value of the property taxed. It is doubtless true that it has been held that forbidding an exemption from taxation and requiring taxation according to the " true value in money " forbids taxation otherwise than in accordance with established general rules in respect to valuation and prevents a commutation on a different basis; yet there have been rulings of the Supreme Court of Minnesota to the effect that commutation is not the same as exemption, or forbidden by a constitutional provision which forbids exemption, and that it may sometimes be the surest way of reaching taxation according to the " true value in money," and is, therefore, not necessarily an infringement of a constitutional provision requiring such taxation. Thus, in *County of Hennepin* v. *Railway Company*, 33 Minnesota, 534, 535, the court said :

" This is not an immunity from taxation, but a commutation of taxes—another and substituted way prescribed by law, in which the respondent, as the owner of this land among other property, is to contribute its share to the public revenue."

And in *County of Ramsey* v. *Railway Company*, 33 Minnesota, 537, 542 :

" It was not in reality a plan for *exempting* property from taxation, but a substituted *method* of taxation. It must be supposed that it was contemplated that this system would, upon the whole, fairly effect the objects of taxation with respect to such corporations, and be equivalent in its results to taxation of the property owned by them."

So also in *County of Todd* v. *Railway Company*, 38 Minnesota, 163, 165 :

" It has been considered that the purpose of such statutes has been, not to exempt property from taxation, but to provide a substituted method of securing to the State its proper revenue from the taxable property of these corporations. *City of St. Paul* v. *St. Paul & Sioux City R. R. Co.*, 23 Minn. 469; *County of Hennepin* v. *St. Paul, M. & M. Ry. Co.*, 33 Minn. 534, 535; *County of Ramsey* v. *Chicago, Mil. & St. Paul Ry. Co., supra.* "

And further, in *St. Paul* v. *Railway Company*, 39 Minnesota, 112, 113 :

" As was said in *Ramsey County* v. *Chicago, Mil. & St. Paul Railway, supra,* these charters do not exempt the property from taxes, but provide a substituted method of taxation, based upon the assumption that the property of the companies will be used for railroad purposes, and thereby an income. be derived, the percentage of which received by the State will be equivalent in its results to taxation of the property."

And again, in *State* v. *Luther,* 56 Minnesota, 156, 160:

" It is a common error, in construing statutes like the present, to assume that because the commuted tax is fixed with reference to, and is wholly derived from, the gross earnings of the road, therefore the lands are exempted from taxation altogether. The percentage of the gross earnings is paid as taxes on both the railroad and the granted lands, and, although derived wholly from the former, is a commutation tax alike on both."

The contract made in 1865 with the predecessor of the St. Paul and Duluth Railroad Company, void at that time but made valid by the constitutional amendment of 1871, (as by the Supreme Court of the State now affirmed,) commuted the taxes on all railroad properties, including its lands not used for railroad purposes, by the payment of three per cent on its gross earnings. Confessedly after that amendment there existed a binding contract between the State and the railroad companies, by which the taxes on all their property were to be commuted and discharged on the payment of three per cent of the gross earnings. If nothing had since occurred that contract, under the decision of the Supreme Court, would continue exempting lands not used, as well as lands used for railroad purposes, from any other taxation than that which was expressed by three per cent on the gross earnings of the companies. In other words, so far as the railroad companies are concerned, that constitutional amendment did away with the restrictive features of sections 1 and 3 of Article IX in the state constitution, and permitted and endorsed a peculiar method of taxation of railroad companies. The constitutional amendment of 1871 forbade any change by repeal or amendment of laws respecting the taxation of railroad companies except upon a vote of the people. The converse of that proposition may be accepted, to wit, that by a vote of

the people the tax provision concerning railroads might be repealed or amended. But is there no limitation upon the power of amendment? The law of 1895 adopted by the people does not release railroad companies from the burden of paying three per cent upon their gross earnings into the state treasury, but simply operates to put certain properties belonging to them outside of the protection of that commutation. Was such an amendment within the contemplation of the constitutional provision of 1871? It may seem a not unreasonable modification to exempt from the contract such property as is not used for railroad purposes, but would not the legislation assume a different aspect if it had subjected to ordinary taxation all the railroad property, except locomotives, and upon them continued the burden of the payment of three per cent of the gross earnings? Of course, if there be no limitations in respect to the scope of amendment it would be within the power of the State to subject the bulk of the railroad property, whether used or not used for railroad purposes, to the burden of ordinary state taxation; and taking a single item like locomotives, without which the road could not be operated, continue upon the companies the duty of paying three per cent of the gross earnings. While it may be that no such inconsiderate action is to be expected, the possibility of such action suggests a query whether the power of repeal or amendment, preserved by the constitutional amendment of 1871, has not some limitations.

Giving to that power full scope, it may be said that if the prior legislation was unauthorized by the constitution, a repeal of the amendment would wipe out the whole provision in reference to railroad taxation, and subject all railroad property within the limits of the State to the ordinary rule in respect to taxation. So it may be that the reserved power of amendment carries with it the right to increase or diminish the rate per cent of taxation. But a different question is presented when it is insisted that the power of amendment carries with it the right of continuing the rate per cent as to part only, but not all of the property covered by the original contract. For, as stated, if the State can withdraw the lands not used for railroad purposes from the scope of this contract commutation, can it

not to-morrow likewise withdraw the lands which are used for railroad purposes, including therein the right of way, the tracks thereon, all the grounds occupied by station houses, etc., and then, on the day thereafter, withdraw from it all the personal property of the companies, except their locomotives, and still hold the corporations to the burden of the contract? May it not be fairly contended that the privilege of amendment reserved was as to the rate, and not as to the property to be included within the commutation? That the power of amendment has its limitations, or rather that an amendment may not be wholly as to the right of the State, and absolutely ignoring the right of the other party to the contract, has been adjudged by this court in *Louisville Water Company* v. *Clark*, 143 U. S. 1. In that case it was held that while under a statute the water company had been exempted from taxation on condition that it supplied water free to the city of Louisville, an act withdrawing that exemption from taxation, although silent as to the corresponding obligation of the water company, must be construed as releasing it from an obligation based upon such exemption. So it may well be said in the case before us that a contractual exemption of the property of the railroad company in whole, upon consideration of a certain payment, cannot be changed by the State so as to continue the obligation in full, and at the same time deny to the company, either in whole or in part, the exemption conferred by the contract.

But there is another matter of significance. The lands in controversy were granted by Congress to the State as trustee. The act of 1865, by which the State offered the lands to the predecessor of the St. Paul and Duluth Company, is entitled "An act to execute the trust created by the act of Congress." The right of a State to accept such a trust cannot now be doubted. It has become a part of the judicial history of the country. These lands were not donated by Congress to the State, to be used by it for its own benefit and in its own way, but were conveyed to the State in trust with the understanding that, as trustee, it should use them in the best possible manner for accomplishing the purposes of the trust. Of course, this implied that, except as restrained by its own powers, the

State should make the grant as valuable as possible for the accomplishment of the purpose of the trust. Under those circumstances the peculiar nature of the trust created enabled the State to determine the limits and mode of taxation to which that property thus placed in its hands should be subjected. It might have provided that the title be retained by the State, that no conveyance be made to the railroad company, and that the first and only conveyance should be when the railroad company had made a contract with some individual for its purchase, and that contract had been completed by full payment to the company. Is it to be doubted that the State, retaining the title, although authorizing the railroad company to sell, could, while that title was so retained, hold it free from any kind of taxation? Would it not be a legitimate and appropriate discharge of the trust conferred if the State adjudged that such property should be held in its own name free from all taxation until such time as its full value in cash could be obtained from some individual? If the State could retain the title free from taxation until such time as its disposition to a private purchaser enabled the railroad company to realize the full value of the land, was it not also within its power to say that a temporary transfer to the corporation charged with the duty of constructing the railroad should also be accompanied by a like exemption from taxation? And if it could exempt from all taxation, it. might with equal propriety say that it should be subjected to taxation in only a limited way.

Of course, it may be said, and in a general way rightfully so, that the powers of the legislature of a State are limited by its constitutional provisions. It follows therefrom that in dealing with property generally the legislature must, in respect to taxation, as in all other matters, keep within the express constitutional. limits as interpreted by the highest court of the State. We would not weaken, even if we had authority so to do, the full scope of this constitutional obligation. Whatever the people, framing their organic act, have declared to be the limits of legislative power, and the modes in which that power shall be exercised, must always be recognized by the courts, state and national, as obligatory. And if the property in controversy was

that which passed directly into the mass of the general property of the State it might properly be said that the construction placed on constitutional limitations by the Supreme Court of the State determined absolutely for all courts, state and national, the full scope of the legislative power.

And in this respect we may notice the suggestion of the Supreme Court of the State, that other lands than these might be withdrawn from the general rule of taxation provided by the state constitution, and the statement made by counsel in argument that many corporations had received in the early days of the State commutations based on a like principle. We quote the language of the Supreme Court:

" It is further claimed on behalf of the appellants that the mandates and inhibitions of the constitution as to the taxation of all private property have no application to public lands which passed into private ownership with the privilege of commuted taxation created with respect to them while they were yet public lands. If this proposition is true, then the legislature, if there are no other constitutional provisions prohibiting it, may provide for exempting from taxation the school lands of the State after their sale and after they have become absolutely private property, or provide that the owners thereof may forever pay a percentage on the gross or net income derived therefrom in lieu of all other taxes.

" The mandate of the constitution applies to all property which is the subject of private ownership, without reference to the source of its acquisition. It would be a palpable evasion of the constitution to permit the legislature to absolutely transfer public lands to private owners vested with the privileges and immunities as to taxation which are prohibited by the constitution."

We think the apprehension of the Supreme Court is one more of imagination than of fact. It is true that Congress might act so as in effect to keep withdrawn a large area of the State from taxation. Under the reservation in the act of admission and the acceptance thereof by the State of Minnesota the right of Congress to determine the disposition of public lands within that State was reserved, and, according to the decision in *Van*

*Brooklin* v. *State of Tennessee, infra,* lands belonging to the United States are exempt from taxation by the State. So that if Congress should determine that the great body of public lands within the State of Minnesota should be reserved from sale for an indefinite period it might do so, and thus the lands be exempted from taxation; and yet it cannot be imputed to Congress that it would discriminate against the State of Minnesota or pass any legislation detrimental to its interests. It had the power to withdraw all the public lands in Minnesota from private entry or public grant, and, exercising that power, it might prevent the State of Minnesota from taxing a large area of its lands, but no such possibility of wrong conduct on the part of Congress can enter into the consideration of this question. It is to be expected that it will deal with Minnesota as with other States, and in such a way as to subserve the best interests of the people of that State. That a power may be injuriously exercised is no reason for a misconstruction of the scope and extent of that power. So the fact that Congress might, if it saw fit, withdraw the public lands in Minnesota from sale, and thus prevent their taxation, furnishes no reason for denying the efficacy of the power to grant such lands, subject to conditions binding upon the State, or the right of the State, as its trustee, to prescribe limitations upon taxation. And this must be said bearing in mind that to the full extent there is no question of the duty of the legislature of Minnesota to subject any but trust property to the absolute scope of its constitutional provisions in respect to the matter of taxation. And in respect to the lands in controversy it must be remembered that they were granted to and accepted by the State in trust, and it cannot be doubted that the State has the power to compel its grantee to use the lands in furtherance of the trust and prevent it from creating a large and permanent ownership of lands.

When Minnesota was admitted into the Union, and admitted on the basis of full equality with all other States, there was within its limits a large amount of lands belonging to the national government. The enabling act, February 26, 1857, 11 Stat. 166, authorizing the inhabitants of Minnesota to form a constitution and a state government, tendered certain proposi-

tions to the people of the Territory, coupled in section 5 with this proviso (11 Stat. 167):

" The foregoing propositions herein offered are on the condition that the said convention which shall form the constitution of said State shall provide, by a clause in said constitution, or an ordinance, irrevocable without the consent of the United States, that said State shall never interfere with the primary disposal of the soil within the same, by the United States, or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof; and that no tax shall be imposed on lands belonging to the United States, and that in no case shall non-resident proprietors be taxed higher than residents."

And article 2, section 3, of the constitution, passed by virtue of this enabling act, reads as follows (Gen. Stat. Minn. 1894, p. lxxiv):

" The propositions contained in the act of Congress entitled ' An act to authorize the people of the Territory of Minnesota to form a constitution and state government preparatory to their admission into the Union on an equal footing with the original States,' are hereby accepted, ratified and confirmed, and shall remain irrevocable without the consent of the United States; and it is hereby ordained that this State shall never interfere with the primary disposal of the soil within the same, by the United States, or with any regulations Congress may find necessary for securing the title to said soil to *bona fide* purchasers thereof; and no tax shall be imposed on lands belonging to the United States, and in no case shall non-resident proprietors be taxed higher than residents."

That these provisions of the enabling act and the constitution, in form at least, made a compact between the United States and the State, is evident. In an inquiry as to the validity of such a compact this distinction must at the outset be noticed. There may be agreements or compacts attempted to be entered into between two States, or between a State and the nation, in reference to political rights and obligations, and there may be those solely in reference to property belonging to one or the other. That different considerations may underlie the question

as to the validity of these two kinds of compacts or agreements is obvious. It has often been said that a State admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations ; whereas, on the other hand, a mere agreement in reference to property involves no question of equality of status, but only of the power of a State to deal with the nation or with any other State in reference to such property. The case before us is one involving simply an agreement as to property between a State and the nation.

That a State and the nation are competent to enter into an agreement of such a nature with one another has been affirmed in past decisions of this court, and that they have been frequently made in the admission of new States, as well as subsequently thereto, is a matter of history. Section 10 of article 1 of the Constitution provides that "no State shall, without the consent of Congress, . . . enter into any agreement or compact with another State." It was early ruled that these negative words carried with them no denial of the power of two States to enter into a compact or agreement with one another, but only placed a condition upon the exercise of such power. Thus in *Green* v. *Biddle*, 8 Wheat. 1, a compact between Virginia and Kentucky was sustained, and it was held no valid objection to it that within certain restrictions it limited the legislative power of the State of Kentucky. In *Poole* v. *Fleeger*, 11 Pet. 185, an agreement between Kentucky and Tennessee as to boundary was upheld, Mr. Justice Story, speaking for the court, saying (p. 209):

"It cannot be doubted that it is a part of the general right of sovereignty, belonging to independent nations, to establish and fix the disputed boundaries between their respective territories ; and the boundaries so established and fixed by compact between nations become conclusive upon all the subjects and citizens thereof, and bind their rights ; and are to be treated, to all intents and purposes, as the true and real boundaries. This is a doctrine universally recognized in the law and practice of nations. It is a right equally belonging to the States of this

Union, unless it has been surrendered under the Constitution of the United States. So far from there being any pretense of such a general surrender of the right, that it is expressly recognized by the Constitution, and guarded in its exercise by a single limitation or restriction, requiring the consent of Congress. The Constitution declares that ' no State shall, without the consent of Congress, enter into any agreement or compact with another State,' thus plainly admitting that, with such consent, it might be done, and in the present instance that consent has been expressly given. The compact, then, has full validity, and all the terms and conditions of it must be equally obligatory upon the citizens of both States."

The same doctrine was announced in *Virginia* v. *Tennessee*, 148 U. S. 503, and in the opinion in that case it was intimated that there were many matters in respect to which the different States might agree without the formal consent of Congress. In this case the difference between the agreements which States might enter into between one another and those from which they were debarred without the consent of Congress was noticed, and it was said (p. 518):

"There are many matters upon which different States may agree that can in no respect concern the United States. If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter State might desire to acquire as a site for a public building, it would hardly be deemed essential for the latter State to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land. If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal, it would hardly be deemed essential for that State to obtain the consent of Congress before it could contract with New York for the transportation of the exhibits through that State in that way. If the bordering line of two States should cross some malarious and disease-producing district, there could be no possible reason, on any conceivable public grounds, to obtain the consent of Congress for the bordering States to agree to unite in draining the district and thus removing the cause of

disease.   So in case of threatened invasion of cholera, plague, or other causes of sickness and death, it would be the height of absurdity to hold that the threatened States could not unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of Congress, which might not be at the time in session.   If, then, the terms 'compact' or 'agreement' in the Constitution do not apply to every possible compact or agreement between one State and another, for the validity of which the consent of Congress must be obtained, to what compacts or agreements does the Constitution apply?   . . .

"Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.   Story, in his Commentaries, sec. 1403, referring to a previous part of the same section of the Constitution, in which the clause in question appears, observes that its language 'may be more plausibly interpreted from the terms used, " treaty, alliance or confederation," and upon the ground that the sense of each is best known by its association (*noscitur a sociis*) to apply to treaties of a political character, such as treaties of alliance for purposes of peace and war, and treaties of confederation, in which the parties are leagued for mutual government, political coöperation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges;' and that ' the latter clause, " compacts and agreements," might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty, such as questions of boundary, interests in land situate in the territory of each other, and other internal regulations for the mutual comfort and convenience of States bordering on each other.'   And he adds: 'In such cases the consent of Congress may be properly required, in order to check any infringement of the rights of the national government; and, at the same time, a total prohibition to enter

into any compact or agreement might be attended with perma-
nent inconvenience or public mischief.'"

If as "a part of the general right of sovereignty" to which
Mr. Justice Story refers in the quotation above made, the right
of agreement between one another belongs to the several States,
except as limited by the constitutional provisions requiring the
consent of Congress, equally true is it that a State may make a
compact with all the States, constituting as one body the nation,
possessed of general rights of sovereignty and represented by
Congress. That Congress has consented is shown by the fact
that it proposed the terms of the agreement and declared the
State admitted on its assent to those terms.

The Constitution, article 1, section 8, provides that—

" The Congress shall have power to exercise exclusive legis-
lation in all cases whatsoever, over such district (not exceeding
ten miles square) as may, by cession of particular States and
the acceptance of Congress, become the seat of the government
of the United States, and to exercise like authority over all
places purchased by the consent of the legislature of the State
in which the same shall be, for the erection of forts, magazines,
arsenals, dock yards and other needful buildings."

By an act of February 22, 1875, the legislature of Kansas
ceded to the United States jurisdiction over the territory of the
Fort Leavenworth Military Reservation, reserving not only the
right to serve civil and criminal process, but also the right to
tax railroad, bridge and other corporations, their franchises and
property, within the limits of the reservation. And in *Fort
Leavenworth Railroad Company* v. *Lowe*, 114 U. S. 525, that
cession was held valid, Mr. Justice Field, delivering the opin-
ion of the court, saying in reference to this question (p. 541):

" In their relation to the general government, the States of
the Union stand in a very different position from that which
they hold to foreign governments. Though the jurisdiction
and authority of the general government are essentially different
from those of the State, they are not those of a different country;
and the two, the state and general government, may deal with
each other in any way they may deem best to carry out the
purposes of the Constitution."

The act admitting Kansas into the Union contained in its first section this provision (12 Stat. 127):

" That nothing contained in the said Constitution respecting the boundary of said State shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, . . . or to affect the authority of the government of the United States to make any regulation respecting such Indians, their lands, property or other rights, by treaty, law or otherwise, which it would have been competent to make if this act had never been passed."

Under the provisions of the treaty of 1854, between the Shawnee Indians residing within the territory of Kansas and the United States, certain of their lands were allotted to individual members and patented to them, with the express restriction that " the said lands shall never be sold by the grantee, or his heirs, without the consent of the Secretary of the Interior." In the case of *The Kansas Indians,* 5 Wall. 737, 757, this court, holding a law of the State of Kansas subjecting these lands to taxation invalid, said:

" There can be no question of state sovereignty in the case, as Kansas accepted her admission into the family of States on condition that the Indian rights should remain unimpaired, and the general government at liberty to make any regulation respecting them, their lands, property or other rights, which it would have been competent to make if Kansas had not been admitted into the Union. . . . While the general government has a superintending care over their interests, and continues to treat with them as a nation, the State of Kansas is estopped from denying their title to it. She accepted this status when she accepted the act admitting her into the Union." See also *Beecher* v. *Wetherby,* 95 U. S. 517, 523.

But we need not go outside of the present case. The State of Minnesota accepted the trust created by the act of Congress. Acceptance by a trustee of the obligations created by the donor of a trust completes a contract. Such contracts, as we have seen, have been frequent in the history of the nation, and their

validity has not only never been questioned but has been directly affirmed.    *Tucker* v. *Ferguson,* 22 Wall. 527.

There is nothing in the case of  *Van Brocklin* v. *State of Tennessee,* 117 U. S. 151, in conflict with these views.    In that case it was held that property of the United States, situated within the limits of a State, was exempt by the Constitution of the United States from taxation by that State ; and while, referring to the many exemption clauses in different acts of admission of States, it was said that they were but declaratory of the law and conferred no new right or power on the United States, it was not held that if in the absence of such exemption clauses the lands of the United States would have been subject to taxation, the compact thereby created would not have been operative to relieve them.    And it must be remembered that the question here is not as to exemption, but as to full control over the matter of sale and disposal.

Returning, then, to the facts of the case before us, by the provisions quoted the State expressly agreed that no tax should be imposed on lands belonging to the United States, that it should never interfere with the primary disposal of the soil within the State by the United States, or with any regulations Congress might find necessary for securing the soil to *bona fide* purchasers thereof.    These provisions are not to be construed narrowly or technically, but as expressing a consent on the part of the State to the terms proposed by Congress ; and among these terms were that the full control of the disposition of the lands of the United States should be free from state action.    Whether Congress should sell or donate ; what terms it should impose upon the sale or donation ; what arrangements it should make for securing title to the beneficiaries—were all matters withdrawn from state interference by the terms of the enabling act and the Constitution.    With this full reservation of power in Congress it is not open to doubt that that body might have made such disposition of the public lands of the United States within the State as would withhold them from the burdens of state taxation, not only until such time as all interest of the United States in the lands had ceased, but also until they had been used to fully accomplish the purposes for which Congress was selling or donating them.

It is true, as has been held in the ordinary administration of the affairs of the land department, that whenever full payment has been made to the United States, and the full equitable title has passed to an individual purchaser or homesteader, the mere delay in furnishing to such purchaser or homesteader the legal evidence of his title does not relieve the land from ordinary state taxation. *Carroll* v. *Safford,* 3 How. 441; *Witherspoon* v. *Duncan,* 4 Wall. 210; *Wisconsin Central R. R. Co.* v. *Price County,* 133 U. S. 496; *Northern Pacific R. R. Co.* v. *Patterson,* 154 U. S. 130.

But it has also been held that until the very last moment that liens or equitable rights of the United States are extinguished, no matter how trivial or small may be the right or the lien reserved, the land is not subject to state taxation. *Railway Company* v. *Prescott,* 16 Wall. 603; *Railway Company* v. *McShane,* 22 Wall. 444; *Colorado Company* v. *Commissioners,* 95 U. S. 259; *Northern Pacific R. R. Co.* v. *Traill County,* 115 U. S. 600; *Wisconsin Central R. R. Co.* v. *Price County,* 133 U. S. 496.

But whatever may be the rule applicable in the ordinary administration of affairs in the land department, the provisions of the enabling act and the state constitution, before referred to, secure to the United States full control of the disposition of the public lands within the limits of the State. Within the scope of this reserved power Congress might grant to a railroad corporation public lands to aid in the construction of its road, withholding not only the legal title, but also exemption from state taxation until such time as some one should pay into the treasury of the company the full value of the land in money to be used in the construction of its road. It would be a part of the power reserved in Congress to determine the terms and conditions upon which title should effectually pass from the government. If Congress has a right to make a private corporation its agent to thus utilize to the fullest extent the value of the land it is willing to give to aid a public enterprise, it may deal with a State upon the same basis. The State, accepting the trust given by Congress, has all the powers of a trustee, and must have also all the freedom of a trustee, and may determine in what way that

trust may be most successfully carried out.   The mere fact that the legal title has passed by act of Congress from the nation to the State is not the vital fact.   Under section 3, article IX, of the state constitution public property used exclusively for any public purpose is exempted from taxation.   It is undoubtedly true as a general rule that a State does not tax its own property, but we do not rest on this express language of the state constitution.   We place our conclusion upon higher grounds. Accepting this property as a trustee, as it had a right to do, it was not compelled to weaken the full accomplishment of that trust by subjection of the lands to taxation.

We do not mean to hold that it was bound to exempt the land, either permanently or for any specified time, from taxation if in its judgment as trustee it believed that the purpose of the trust could be otherwise fully and fairly accomplished ; and to that extent, and no further, goes the opinion in *Tucker* v. *Ferguson, supra.*   In that case the State saw fit to tax the land after the lapse of a certain time, in respect to which Congress had prescribed an exemption, and it was said by Mr. Justice Swayne, on page 572 :

" She was in nowise fettered, except as she had agreed to fulfil all the terms and conditions which accompanied the grant.   To that extent she was clearly bound, and anything in conflict with those conditions would be *ultra vires* and cannot be supported. What were the terms to which she submitted herself ?   She was to devote the lands to the accomplishment of the object which Congress had in view, and there was an implied agreement on her part to take all the measures reasonably within her power. to make their application effectual to that end.   The mode was left entirely to herself.   We see no ground upon which it can be claimed she bound herself any further."

But, if in its judgment, as trustee, the trust could be most effectually accomplished by transferring the lands to some corporation, subject to only a limited taxation until such time as the full value of the lands could be secured for the purposes of the trust, it was not prevented from so doing by any obligation which it was under in respect to the general mass of property within the State.   When the State accepted the position of

trustee it had all the freedom of judgment which belongs to a trustee in respect to the best means of carrying the trust into execution. The legislature was the body representing the State, whose judgment was invoked as to such means, and its action was taken not so much in discharge of its constitutional obligations to the people as of its contract obligations as trustee to the grantor of the trust. In other words, the State either could not accept the trust, or accepting it was entitled to all the freedom of judgment which attends the action of a trustee, and, as we have seen, it is too late in the history of railroad aid legislation in this country to hold that a State cannot accept the position of trustee of such a grant.

Congress, acting for the United States—the owner of the lands—could, by virtue of the compact with the State, have in creating the trust provided specifically for an exemption, or for taxation in a limited way. Having failed to so prescribe the manner in which the trust should be executed, the power became vested in the trustee, the State, and it exercised it in the way indicated by the legislation of 1865 and 1870. Having that power as trustee, it could make a valid contract in respect thereto with the corporations, and they, investing their money in the construction of the road on the faith of the contract tendered and accepted, are entitled to be protected against any subsequent legislative impairment in respect thereto.

For these reasons we are of opinion that there was a valid contract made with these companies in respect to the taxation of these lands—a contract which it was beyond the power of the State to impair; that this subsequent legislation does impair that contract, and cannot, therefore, be sustained.

*The judgment of the Supreme Court of Minnesota is reversed, except as to lands belonging to the Great Northern Railway Company, and the case is remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE BROWN concurred upon the ground that the legality of commuting the payment of taxes upon railway property by a payment of a percentage upon the gross earnings, having been recognized by the legislature and the Supreme

Court of Minnesota for thirty years, and also having been recognized as valid in the constitutional amendment of 1871, it is too late to set up its repugnance to the state constitution as against railways which were built upon the faith of its validity.

Mr. Justice White, with whom concurred Mr. Justice Harlan, Mr. Justice Gray and Mr. Justice McKenna, assenting to the judgment of reversal.

The act which was accepted by the corporation, and which is now decided to be an irrevocable contract protected from impairment by the Constitution of the United States, in substance provided that in lieu of all other taxes upon its property of every kind and nature, whether real or personal, the railroad company should annually pay a fixed gross receipt tax of three per cent. It, however, provided that the public lands which the State had received from the United States, and which it had given to the corporation to aid in the construction of its railroad, might be taxed by the State in addition to the three per cent gross receipt tax whenever the corporation had parted with its title to such property. When this gross receipt tax was enacted the constitution of the State commanded that taxation should be equal and uniform, and that property should be assessed according to valuation. In addition express authority was given to exempt from taxation certain enumerated classes of property, such as universities, schools, churches, burying grounds, etc. From this it resulted that the legislature was deprived of the right to exempt persons or property in any case unless embraced in the classes as to which the power to exempt was specifically granted as above stated. This is not disputed. It follows then that if the gross receipt tax was an exemption it was void, because repugnant to the constitution of the State. If so void, it did not create a contract, within the contract clause of the Constitution of the United States, for rights protected from impairment could not flow from an act which had no legal existence. The conclusion then that the act which imposed the gross receipt tax created a contract protected from impairment by the Constitution of the United States must rest

on the premise that such act was not an exemption. To this proposition I cannot give my assent.

True it is that in *McHenry* v. *Alford*, 168 U. S. 651, a territorial legislative act, which taxed a railroad corporation by a levy on its gross receipts, was decided not to be a violation of the organic act of the territory which commanded that taxation should be uniform, and that all property should be assessed by a method of valuation. But in that case no question of contract was involved, and the issue presented and the one decided was that the territorial legislature, in selecting a gross receipt tax as the method for reaching railroad property, did not necessarily violate the organic law of the territory as to uniformity and valuation. But this ruling is inapposite to the present case, where the question is not whether the legislature of Minnesota was empowered by the constitution of that State to provide that railroad property should be taxed by a gross receipt tax, but whether, conceding the legislature had the authority to enact such a tax as to railroads or any other class by it selected, it possessed the additional power to enter into an irrevocable contract, by which the method thus selected as to the persons and property designated should be forever thereafter continued.

It seems to me the moment it is admitted that the gross receipt tax is an irrevocable contract, thereby it necessarily results that an exemption from taxation was provided for. The object of forbidding exemptions from taxation is not alone to secure revenue, but is to preserve untrammeled by contract the fullness of all the lawful power of taxation in the successive repositories of such power. In other words, forbidding exemptions in terms directs that no one legislature shall by contract limit the lawful rights of its successors, by taking particular property out of the legislative authority to tax, on the assumption that such persons or property are thereafter to be governed by a contract which exempts from all future exercise of the legislative power of taxation. This seems so obvious that I cannot find words to express the thought that a particular person or property is irrevocably taken, by contract, beyond the reach of the legislative right to tax by any lawful mode deemed from time to time to be best for the public interest, without at the same time saying

that by such an irrevocable contract an exemption from taxation is created.

Nor does it seem to me that the decisions of the Minnesota courts, which are referred to as showing that under the constitution of that State it was competent for the legislature to enact a gross receipt tax law and provide for its continuance by an irrepealable contract, sustain the proposition deduced from them. In no single one of these cases was the question of irrepealable contract presented, considered or decided in any form. Undoubtedly some of these decisions held that a gross receipt tax was valid, just as it was so held in *McHenry* v. *Alford, supra*. But, as I have said, to decide that the general assembly of Minnesota could select a gross receipt tax without violating the rule of uniformity or the requirement of valuation, did not involve the question whether one legislature in exercising its discretion as to such subjects could in addition impose by an irrepealable contract its action on the succeeding legislatures of the State.

The first case which arose in Minnesota, in which the question whether the levy of a gross receipt tax and the acceptance of the terms of the act by a corporation made an irrepealable contract, is the one now here, and there can be no question that the Supreme Court of Minnesota has declared unequivocally that the element of irrevocable contract, if upheld, would cause the act or acts to become exemptions, and· therefore repugnant to the constitution of the State. Even if, however, the Minnesota decisions, prior to the one now before us, had the import which is deduced from them, in my opinion they would not be decisive of this controversy. The decisions in question were not rendered prior to the enactment of the gross receipt tax, which is here in controversy, and therefore it cannot be argued that they entered into and formed a part of such act. In adjudging· whether a contract has been impaired by subsequent legislation, it is elementary that this court determines for itself whether there was a contract. Whilst it is true that in making such inquiry the persuasive power of state decisions will be taken into view, nevertheless the duty ever remains to determine independently whether the contract existed which it is asserted has been

impaired. Discharging such duty in this case, in view of the provisions of the constitution of the State of Minnesota, my mind cannot be persuaded to the conclusion that an agreement is not an exemption by which a particular person or property is forever, as regards taxation, by irrevocable contract, exempted from the general rules of taxation.

Nor can I agree because the State of Minnesota received public land from the United States to be used to aid in the construction of a railroad, the general assembly of that State was thereby endowed with the attribute of dealing with such land in violation of the constitution of the State. The constitution of the State was the measure of the powers of the legislature of Minnesota, and in our system of government I do not conceive that Congress can confer upon a state legislature the right to violate the constitution of the State. True it is that in taking the land a relation of trust was engendered, by which the obligation arose to devote the lands to the purpose for which they had been entrusted by Congress to the State. But this it seems to me can only signify that the State of Minnesota, through its legislature, was obliged to use the lands in furtherance of the trust, in accordance with the powers and under the restrictions imposed by the constitution of the State. Whilst this reasoning is alone to my mind sufficient to refute the theory that the gift by Congress could endow the general assembly with power to disregard the constitution of the State, even if Congress had so expressly directed, the conclusion is cogently reinforced when it is considered that no provision was made by Congress in giving the lands to the State, that in using such lands for the purposes specified in the grant the State should exempt them by irrevocable contract from taxation. Even if it be conceded *arguendo* only that such a power could have been lawfully imposed, its exercise ought not to be implied in order thereby to prevent the legislature of the State from using its taxing authority free from the restraints of an irrevocable contract. But again, if it be conceded that Congress could lawfully have authorized the legislature of the State of Minnesota to violate the constitution of that State, and even if it be granted that Congress did so, these concessions should not affect the de-

cision of this case.   For if such power existed, it could only relate to lands given by the United States, and not to all the other real and personal property of the railroad, which came not from the grant by the United States to the State.  But the irrevocable contract which is now decided to have been lawfully made by the general assembly of the State of Minnesota was not one dealing only with the lands given by the United States, but was one relating to all the property of the railroad. To enforce its obligations therefore, under the assumption of a trust as to lands given by the United States, is to restrain the power of the State by contract as to property within its borders, not received from Congress, not embraced by the trust, and over which the plenary taxing power of the State extends.

Because the provision as to the lands given by Congress to the State is indivisibly united with the other provisions contained in the gross receipt tax law, it does not follow that that which is confessedly repugnant to the constitution of the State should be held to be valid; but it should rather, I think, be decided that the vice which affects a part, and which cannot be separated, operates upon the contract as an entirety and causes the whole to be void.

Although I dissent, for the foregoing reasons, from some of the grounds stated in the opinion of the court, I yet concur in the judgment of reversal upon one ground expressed therein. Conscious that nothing is needed to strengthen the conclusive reasoning by which the proposition is sustained in the opinion of the court, nevertheless, as the question presents itself to my mind in a somewhat different aspect from that considered by the court, the additional grounds which cause me to concur will now be stated.

In 1871 an amendment to the constitution of Minnesota, which is set out in the opinion of the court, was adopted by a vote of the people.  The opinion of the Supreme Court of Minnesota in the case at bar holds that the effect of that amendment was to ratify and confirm the gross receipt tax laws and to deprive the general assembly of all power to repeal or amend such laws, unless the legislative act so doing was submitted to and ratified by a vote of the people.  Accepting this construc-

tion as conclusive, it follows that the gross receipt tax laws, even if they contained a grant of exemption, were no longer in violation of the constitution of the State, but did not evidence irrevocable contracts, since they were subject to repeal or amendment by a legislative act approved and ratified by a vote of the people. This suit rests upon an act of the general assembly of Minnesota, approved by the people in 1896, which it is claimed was the first act which repealed or amended the gross receipt tax law relating to the rights of the corporation now here, to the extent that it provided that the public lands given to the railroad should be taxed before the corporation had parted with its title. Before examining the scope of the act relied upon, it is important to bear in mind the relations which are engendered when a contract is entered into by a State subject to the reserved power to repeal, alter or amend. In such case no irrepealable contract, protected from impairment under the Constitution of the United States, takes effect, because it is impossible to conceive that contract rights which are conferred subject to the power of repeal, alteration or amendment are protected from an impairment which under the terms of the grant the State has reserved a right to make. *Louisville* v. *Bank of Louisville*, 174 U. S. 439, 444; *Citizens' Savings Bank* v. *Owensboro*, 173 U. S. 636, 644, *et seq.*

But whilst this is settled, it has also been equally determined that the reserved right to repeal, alter or amend does not confer mere arbitrary power, and cannot be so exercised as to violate fundamental principles of justice by depriving of the equal protection of the laws or of the constitutional guarantee against the taking of property without due process of law. *St. Louis, Iron Mountain &c. Railway* v. *Paul*, 173 U. S. 404, 408, and cases cited. And an apt illustration of the application of this doctrine is found in *Louisville Water Co.* v. *Clark*, 143 U. S. 1.

Will, then, the enforcement of the amendatory act, which is here relied upon, providing for the taxation of the lands, before the corporation had parted with its title to them, in spite of the continued exaction of the gross receipt tax, deprive the corporation of its property without due process of law, or deny to it the equal protection of the laws? The repealing act says:

" SEC. 1. All lands in this State heretofore or hereafter granted by the State of Minnesota or the United States or the Territory of Minnesota to any railroad company shall be assessed and taxed as other lands are taxed in this State, except such parts of said lands as are held, used or occupied for right of way, gravel pits, side tracks, depots, and all buildings and structures which are necessarily used in the actual management and operation of the railroads of said companies." '

But these provisions, which in and of themselves are clearly an amendment of the gross receipt tax laws, are accompanied by the following proviso:

" Provided, that said railroad companies shall continue to pay taxes into the state treasury upon their gross earnings *in the same manner* and *in the same amount* as is now provided by law, and that nothing in this act contained *shall be construed to repeal said laws*, except in so far as the same relate to the tax upon said lands." [Italics are mine.]

Considering for a moment the ratified agreement which the gross receipt tax law embodied, it is patent that the duties which it imposed and the obligations to which it gave rise were' in the strictest sense reciprocal or commutative; that is, that the agreement to pay the gross receipt tax, and necessarily the amount of those taxes, was predicated on the obligation on the part of the State to regard the payment of said tax as the discharge by the corporation of all taxes due upon all its real or personal property. The amendatory act, therefore, whilst increasing the sum of the obligation of the corporation to the State to the extent that the lands are no longer to be represented by the gross receipt tax, yet at the same time retains in favor of the State the right to take the whole amount of the stipulated payment of the gross receipt tax in the same manner as theretofore, that is, by the contract. That is to say, the amendatory act preserves the contract in favor of the State as an entirety, by retaining all the obligations due by the railroad to the State, and yet purports to repeal, alter or amend the contract by relieving the State from its obligation to the corporation to include all the property of the latter for the purpose of taxation by a gross receipt tax, which was the consideration upon which the obliga-

tion of the corporation to pay such tax rested. This consequence is made certain by the provision that the gross receipt tax, despite the amendment, shall remain payable *in the same amount,* and *in the same manner* as before the passage of the amendatory act, and is additionally made evident by the provision of the amendatory act declaring that it "*shall not be construed to repeal*" the gross receipt tax act. The situation created by the amendatory act may be thus illustrated: The State leases a building to it belonging for a term of years, conditioned on the payment of a stipulated amount of rent annually. The consideration of the obligation of the lessee to pay in such case would of course be the right of occupation granted by the State, and the continued right of the State to collect the rent would depend upon the enjoyment by the tenant of the right of occupation which the contract granted. Now, then, if in such a contract the power was reserved to repeal, alter or amend, and it was exercised by declaring that the right of occupation should cease, but that the duty to pay the rent should continue in the same amount and in the same manner stated in the contract, and that nothing in the amendatory act should be construed as relieving the lessee from the duty to pay the whole of the stipulated rent, a condition strictly analogous to that which arises from the amending act relied on in the case at bar would be presented.

My understanding does not permit me to doubt that to preserve in this case the contract in its entirety, so far as the rights of the State are concerned, and at the same time to destroy the reciprocal duty owed by the State to the other contracting party, is not to repeal, alter or amend the contract at all, but, whilst preserving it, to endeavor by an act of arbitrary power to impose a burden incompatible with the very provisions and terms of the amendatory act itself. As has been previously said, the consideration of the contract obligation of the corporation to pay the gross receipt tax was the duty on the part of the State to consider such payment as a discharge of all taxes upon all the real and personal property of the corporation. The agreements being thus interdependent are of necessity indivisible, and to retain the entire duty or right of one party to

the contract must lead to the preservation of the corresponding and reciprocal right or duty of the other. In reason, the argument comes to this, that the act purporting to amend, on its face cannot be declared to have done so, without concluding at the same time both that it did alter, repeal and amend, and that it did not. Under these circumstances, to enforce the amendatory act would necessarily be to deny to the corporation the equal protection of the laws, since it would leave the corporation subject to taxation, not by the general laws of the State but by the provisions of a contract, and at the same time subject the corporation to a burden wholly incompatible with its liability under the contract. It would be a denial of due process of law to the corporation, since it would be but the recognition of the right of the State, without hearing and without process of any kind, to condemn the corporation to the performance of a duty alleged to be resting on it, and at the same time retain in favor of the State as against the corporation an obligation wholly at variance and in absolute conflict with the supposed duty arbitrarily declared by the amendatory act to rest upon the corporation.