# ANDRUS, SECRETARY OF THE INTERIOR v. IDAHO ET AL.

No. 79–260.   Argued February 25, 1980—Decided April 16, 1980

716

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 731.

*Stuart A. Smith* argued the cause for petitioner. On the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, William Alsup, Jacques B. Gelin,* and *Edward J. Shawaker.*

*David H. Leroy,* Attorney General of Idaho, argued the cause for respondents. With him on the brief were *W. Hugh O'Riordan* and *Josephine P. Beeman,* Deputy Attorneys General.*

---

*Briefs of *amici curiae* urging affirmance were filed by *Terry L. Crapo* and *Rex E. Lee* for the Idaho Carey Act Development Association; and by

MR. JUSTICE WHITE delivered the opinion of the Court.

The Carey Act of 1894, ch. 301, § 4, 28 Stat. 422, 43 U. S. C. § 641, "to aid public-land States" in the reclamation of desert lands, authorizes the Secretary of the Interior upon proper application "to contract and agree, from time to time . . . binding the United States to donate, grant, and patent" such desert lands, not exceeding a specified acreage, as the State should cause to be irrigated, reclaimed, and occupied, provided, however, that the lands would be restored to the public domain if reclamation had not begun and plans were not carried out within stated time limits. Originally, each State covered by the Act was limited to one million acres; but in 1908, the ceiling for Idaho was raised to three million acres. Also, in 1910, upon request of a State, the Secretary was authorized to withdraw desert lands temporarily from the public domain prior to the State's submission of a formal plan under the Carey Act. 36 Stat. 237, 43 U. S. C. § 643 (1970 ed.).[1]

Of all Carey Act patents issued, a large majority were issued early in the century, the scarcity of water for irrigation being primarily responsible for the absence of patents in the past 30 years. Improved technology for pumping from deep water

the Attorneys General for their respective States as follows: *Robert K. Corbin* of Arizona, *George Deukmejian* of California, *J. D. MacFarlane* of Colorado, *Michael T. Greeley* of Montana, *Richard H. Bryan* of Nevada, *James A. Redden* of Oregon, *Robert B. Hansen* of Utah, *Slade Gorton* of Washington, and *John D. Troughton* of Wyoming.

[1] This legislation was prompted by a desire to prevent speculative filings under entry statutes on land chosen by a State for a Carey Act project. S. Rep. No. 367, 61st Cong., 2d Sess. (1910); H. R. Rep. No. 662, 61st Cong., 2d Sess. (1910). After the decision and judgment of the District Court in this case, this provision was repealed by § 704 (a) of the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. 94–579, 90 Stat. 2792. Under § 204 of FLPMA, 43 U. S. C. § 1714, however, which gives the Secretary the general authority to make withdrawals, the Secretary construes his authority to allow him to withdraw public lands from entry pending submission of a formal plan under the Carey Act.

sources, however, among other things, has revived interest in reclaiming arid lands.

In 1974, the State of Idaho, acting pursuant to 43 U. S. C. § 643, requested that an identified tract of some 27,400 acres be temporarily withdrawn from the public domain pending the submission of a proposed development plan as required by the Carey Act. In January 1975, the Idaho State Office, Bureau of Land Management, rejected the application in part because some of the lands requested had already been withdrawn for other purposes, including a portion being used as a stock driveway. Idaho appealed to the Interior Board of Land Appeals with respect to the lands previously withdrawn for stock-driveway purposes.[2] Idaho also filed with the Board a petition under § 7 of the Taylor Grazing Act, 48 Stat. 1272, as amended, 49 Stat. 1976, 43 U. S. C. § 315f, for reclassification of the stock-driveway lands as suitable for use under the Carey Act.

The Board, in its decision issued on July 31, 1975, found that the applicable regulations prevented it from withholding action on the Carey Act application pending a decision on the Taylor Act reclassification petition.[3] The Board then rejected Idaho's assertion that its Carey Act application took precedence over any withdrawal subsequent to the date of the Act because the Act was a grant *in praesenti* or because

---

[2] On the State's failure to appeal the denial with respect to the lands covered by the application that had been withdrawn for purposes other than a stock driveway, the order as to these lands became final.

[3] The Board cited its stock-driveway regulations providing that "[l]ands withdrawn for driveways for stock . . . are not subject to entry or disposition" and that applications for the acquisition of such lands shall be rejected. 43 CFR § 2313.1 (c) (1974). The Board also relied on a general regulation, 43 CFR § 2091.1 (a) (1974), providing in pertinent part that "applications which are accepted for filing must be rejected and cannot be held pending possible future availability of the land or interests in land, when approval of the application is prevented by . . . [w]ithdrawal or reservation of lands." The Board's prior cases are also to this effect.

the grant, when the specified conditions were fulfilled, related back to the date of the Act. The Board adhered to its prior decision in *State of Wyoming*, 36 L. D. 399 (1908), which held that under the Carey Act "the acceptance of the offer of the State is a matter wholly within the discretion of the Department." That being so, the State had no rights whatsoever to have *any* application approved. The Board further repeated *Wyoming*'s statement that if lands had been withdrawn for other purposes, the presumption that the withdrawal was proper is "conclusive," the lands were not available for a claim under the Carey Act, and the State was not entitled to a hearing "for the purpose of determining whether or not [the Secretary's] discretion has been properly exercised." *Id.*, at 400. The Board, therefore, affirmed the rejection of Idaho's Carey Act application. The case was returned to the Bureau of Land Management for initial action on the petition for reclassification of the stock-driveway lands and for further action on the remaining lands covered by the application for temporary withdrawal.

Meanwhile, in February 1975, the State of Idaho, through its appropriate officials, filed a complaint in the United States District Court for the District of Idaho against the Secretary of the Interior. The State alleged that by virtue of the Carey Act, the United States "has bound itself to donate, grant and patent to the State of Idaho . . . three million acres of desert lands," that "these lands are subject to temporary withdrawal and/or segregation upon [the State's] request," that the Secretary is "without any discretion to deny desert lands once requested," and that the Secretary now asserts that "he will not allow the requests for segregation or withdrawal under the Carey Act as a matter of right." The State prayed for a declaration of its rights under the Carey Act.[4] The Secre-

---

[4] The State alleged jurisdiction in the District Court "by virtue of a federal question existing and amounts of money involved . . . in excess of $10,000, exclusive of costs and interest." The State also alleged juris-

tary's answer admitted that he would not allow requests for segregation or withdrawal as a matter of right but denied the remainder of the foregoing allegations.

On cross-motions for summary judgment, Idaho submitted that the Carey Act had been an immediately effective grant, or at least that the United States was firmly obligated to contract with and patent the statutory acreage to Idaho when and if Idaho satisfied the statutory preconditions. In the State's view, Carey Act applications took precedence over prior withdrawals. The Secretary, therefore, had been wrong to deny Idaho's request for temporary withdrawal, even though the specified lands had already been withdrawn for other purposes. The United States, to the contrary, asserted that the Carey Act granted nothing to Idaho, had not obligated the Secretary to contract with Idaho with respect to any desert lands selected by the State, but had merely authorized the Secretary to contract if he, in his unbridled discretion, saw fit to do so. The Secretary, therefore, had committed no error and had not exceeded his authority under the Carey Act or any other law when he denied the petition for temporary withdrawal.

The District Court, in its memorandum opinion and decision of July 15, 1976, rejected the State's claim that the Carey Act was an *in praesenti* grant giving the State an absolute right to the acreage specified in the Act. The District Court went on to hold, however, (1) that Idaho was "guaranteed a maximum entitlement of three million acres of suitable desert land . . . which it cannot be deprived of by the Secretary of the Interior, if the State meets the conditions of the Carey Act"; (2) that "[t]he Secretary is under an obligation to preserve enough desert land suitable for Carey Act development to fulfill the State's right of entitlement,

---

diction "pursuant to the Federal A. P. A. (5 USC 701 et seq)." The complaint did not recite that the State sought relief pursuant to the Declaratory Judgment Act, 28 U. S. C. § 2201, but the District Court understood the complaint as seeking declaratory relief.

which the Federal Government must contract to donate to the State in accordance with the Act"; and (3) that "[t]o the extent the land has been withdrawn for other purposes" and the State desires the land for Carey Act development, "its remedy is to petition the Secretary to reclassify the lands suitable for Carey Act entry," in which event "[t]he Secretary may not arbitrarily deny the State's application for reclassification," his ruling thereon being subject to judicial review under the Administrative Procedure Act, 5 U. S. C. § 706. 417 F. Supp. 873, 881 (1976). The District Court went on to indicate its affirmance of the Interior Board of Land Appeals' decision and to this extent granted the Secretary's motion for summary judgment.

The Secretary moved for reconsideration and modification of the decision. The District Court again heard oral argument. After first suggesting that the District Court had erred in construing the Carey Act instead of merely sustaining the administrative action, the Secretary then agreed that the case had proceeded as a declaratory judgment action, or at least that it had a declaratory judgment dimension. The Secretary again presented his position that the Carey Act placed no obligation whatsoever on him to enter into any contract with Idaho or to approve any Carey Act application filed by the State.

In this respect, the judge expressed his disagreement and on August 26, 1976, entered his judgment, which, as amended in minor respects on November 15, (1) rejected the State's prayer for declaration of its absolute right to demand three million acres of the public domain without regard to any previous classifications and withdrawals and affirmed the decision of the Interior Board of Land Appeals; (2) declared that Idaho is "entitled to have withdrawn and patented three million acres of the desert lands in the public domain," provided that there are sufficient desert lands within the State of Idaho and provided that Idaho satisfies all the terms and conditions of the Act, and declared that by the Carey Act the

United States had "bound itself to contract, donate, grant and patent to the State of Idaho, upon compliance with the stated conditions, . . . not to exceed three million acres [of desert land], as that sum may be reduced by prior patents issued pursuant to the Carey Act"; and (3) declared that with respect to desert lands presently withdrawn from the public domain for other purposes, the State's remedy, should it desire to initiate Carey Act development on such lands, "is to petition the [Secretary] for temporary withdrawal under 43 U. S. C. Sec. 643 and/or under 43 U. S. C. Sec. 315f, and it is the duty of the [Secretary] to entertain and act upon said petition or petitions in accordance with the public land laws of the United States of America and in accordance with due and proper administrative procedures."

The Ninth Circuit affirmed the judgment "[u]pon the basis of the carefully written opinion" of the District Judge. 595 F. 2d 524 (1979). We granted the petition for writ of certiorari filed by the United States and presenting the single question whether the Carey Act "requires the Secretary of the Interior indefinitely to reserve from appropriation to other public or private uses some 2.4 million acres of desert land within Idaho for the eventuality that the State may be able and willing to select all or any part of such acreage for irrigation and reclamation under the Act." 444 U. S. 914 (1979).

## I

There is first the question raised at the oral argument of this cause whether there is a case or controversy between the State and the Secretary as to anything other than the State's entitlement to the lands that had been withdrawn for stock-driveway purposes and that were involved in its Interior Department appeal; or, to put the matter another way, whether there is a real case or controversy with respect to the issue that the United States presented in its petition for certiorari, namely, whether the State was entitled to 2.4 million acres of desert land which the Secretary then must preserve

for Carey Act development. Although the United States urged on appeal in the Court of Appeals that there was no case or controversy whatsoever, even as to any of the lands covered by Idaho's Carey Act application for temporary withdrawal,[5] the Court of Appeals apparently rejected the argument; the United States raised no jurisdictional question in its petition or its brief; and the Solicitor General at oral argument was of the opinion that the District Court and the Court of Appeals had jurisdiction to enter the judgments that appear in this record. We have the same view.

From the very outset, the State took the position that it is absolutely entitled to select and have withdrawn under the Carey Act up to 2.4 million acres of desert land, provided only that it satisfy the statutory preconditions. Whether or not the lands that it designated had already been withdrawn for other purposes, such as a stock driveway, it was the State's view that the Secretary had no discretion to deny withdrawal of desert lands that the State selected. The Secretary, on the other hand, from the outset, denied that the State had any right to contract for desert lands under the Carey Act and asserted that it was within his discretion to deny any and all state requests for withdrawal or segregation of lands under the Carey Act, whether or not the selected lands were already in use for other purposes. These were the respective positions of the parties in the Interior Department proceedings, with the Interior Board of Land Appeals rejecting the State's and adopting the Secretary's position.

These were also the positions of the parties in the District Court. The State and the Secretary were thus at odds over

---

[5] In the Court of Appeals, the Secretary conceded that a case or controversy had existed with respect to the stock-driveway lands for which temporary withdrawal had been requested under § 643 but asserted that the controversy had become moot with the repeal of § 643. The Secretary now concedes, however, that under the Federal Land Policy and Management Act of 1976, even though it repealed § 643, he has the same power of temporary withdrawal as he had under § 643. See n. 1, *supra*.

the proper construction of the Carey Act, over the State's entitlement under the statute, and over the extent of the Secretary's discretion. If the State was correct as to the meaning of the Act, the denial of its request for withdrawal of the stock-driveway lands was incorrect; but the denial was correct if the Secretary had the better view of the statute. We thus find it undeniable that there was a case or controversy between the Secretary and the State with respect to the approval of its Carey Act application and that the case or controversy in this respect turned on what rights, if any, the State had under this 1894 statute. Although at the time that the case was filed in the District Court, the State's administrative appeal had not yet been decided, a case or controversy in the Art. III sense existed; and, in any event, administrative appellate procedures were soon exhausted. The District Court accepted the case as involving a review of the Secretary's action and as requiring a declaration of the respective rights of the State and the Secretary under the Act.

In proceeding to address the statutory issues tendered by the State, the District Court rejected both the position of the State and that of the Secretary. The State was entitled to up to 2.4 million acres of desert land for which the Secretary was obligated to contract with the State pursuant to the terms of the Act; but the Act was not a grant *in praesenti*, and the State did not have an absolute right to the particular desert lands that it happened to select. If the lands had been withdrawn for another public use pursuant to another statute, the State's remedy was to request reclassification, which the Secretary could not arbitrarily deny. Under this approach, the Secretary was correct in denying the State's request for immediate withdrawal of the lands already in use as a stock driveway; but the Secretary was quite wrong in claiming absolute discretion to deny any Carey Act application, including the State's pending application insofar as it covered lands that had *not* yet been withdrawn for other purposes.

These elements were included in the District Court's judgment and were supported by its opinion. We find no jurisdictional barrier to the entry of such a judgment or to appellate review of that part of the judgment to which the United States objects as a misconstruction of the Carey Act and as an unwarranted extension of rights to the State that would constitute a substantial interference with the authority of the Secretary to manage the public lands.

## II

As was set out above, the judgment declared that Idaho is "entitled" to 2.4 million acres of Carey Act land and that the Secretary is "bound" to contract for such lands. Although the judgment did not prevent the Secretary from putting desert lands to other uses, the judgment, fairly read, would obligate the Secretary to contract with the States for lands selected by it that had not been so withdrawn, if the State complied with the statutory conditions.[6] The Secretary submits that the Act does not so drastically limit his discretion. He also understands these same provisions of the judgment to mean that he "must hold for eventual disposition under the Carey Act approximately 2.4 million acres of unappropriated desert lands." Brief for Petitioner 8. At least that much desert land, he says, must be reserved and may not be put to other uses. Although the judgment does not so provide in so many words, it is fairly arguable that this is what the trial court intended, particularly because in its opinion, which the Court of Appeals made its own, the trial court held that the

---

[6] The State has not cross petitioned from the holding that the Carey Act is not a grant *in praesenti* and that a Carey Act application does not automatically take precedence over prior withdrawals. The State as a respondent is not entitled, absent a cross-petition, to bring that issue before us; for a favorable ruling would enlarge the relief granted the State under the Court of Appeals judgment. The State does of course strongly urge, as it may, that it is entitled to at least what the District Court recognized to be its rights under the Carey Act.

State is "guaranteed" the statutory acreage, "which it cannot be deprived of by the Secretary," and that the Secretary is under an "obligation to preserve enough desert land suitable for Carey Act development" to fulfill the State's entitlement. The precise meaning of the judgment in this respect, however, we do not further pursue; for as we understand the language and legislative history of the Carey Act, it neither requires the Secretary to hold the statutory acreage in reserve nor obliges him always to contract with the State for desert lands that the State selects from those parts of the public domain that have not been withdrawn for other purposes.

The language of the Act [7] "authorize[s] and empower[s]," but does not direct, the Secretary to contract with the State upon the State's proper application. This is permissive language, as compared with the obligatory statutory language requiring the Secretary to issue a patent once he has contracted with the State and the State has satisfied the contractual and statutory conditions. Furthermore, the Secretary may act only with the approval of the President, a provision which strongly suggests that the statutory discretion to con-

---

[7] The Carey Act, 43 U. S. C. § 641, provides in pertinent part:

"To aid the public-land States in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers, the Secretary of the Interior with the approval of the President . . . is authorized and empowered, upon proper application of the State to contract and agree, from time to time, with each of the States in which there may be situated desert lands . . . binding the United States to donate, grant, and patent to the State free of cost for survey or price such desert lands, not exceeding one million acres in each State, as the State may cause to be irrigated, reclaimed, occupied, and . . . cultivated by actual settlers . . . within ten years from the date of approval by the Secretary of the Interior of the State's application for the segregation of such lands. . . ."

Section 641 further provides that if the requirements as to reclamation are not satisfied within certain time periods, the Secretary may restore the lands to the public domain or may authorize limited extension of the deadlines.

tract is broader than merely determining whether the application on its face satisfies the statutory requirements.[8]

In ascertaining the meaning of the relevant language of the Act, it is important to note the circumstances of its adoption in 1894. The initial version of the Act was adopted in the Senate as an amendment to an appropriations bill that had already passed the House. The amendment, which was offered by Senator Carey of Wyoming, was in the form of a Senate bill that had previously been offered by the Senator and passed by the Senate but was still pending before a House committee. This bill, and the amendment to the appropriations bill, provided that each State could select up to the specified acreage of desert lands and that upon selection the lands would be immediately reserved from other entry and would be patented to the State upon proof that the selected land had been suitably reclaimed. The House conferees brought the amended appropriations bill before the House where a substitute for the Senate amendment was offered by Representative McRae and was adopted after full debate. The Conference Committee then adopted the House substitute, and it was this version that became known as the Carey Act.

For present purposes, the principal difference between the

---

[8] The District Court purported to find some support for its conclusion in *Idaho Irrigation Co.* v. *Gooding,* 265 U. S. 518, 521 (1924), where the Court recited that the Carey Act "binds" the United States to donate desert lands to the States. The passage referred to, however, does not say that the United States is bound to contract in the first instance. In any event, that case involved a dispute between an irrigation company and the owners of water rights pursuant to contracts with the company; and it was only in describing the background of the case that the Court referred to the Carey Act. There was no question in that case as to the scope of the State's entitlement under the Act or the scope of the Secretary's discretion. Attaching great significance to this recitation is unwarranted. Nor do we find the other state and federal cases that the District Court cited to be persuasive support for its conclusions as to the Secretary's obligations.

Senate amendment and the McRae substitute was that the former provided for automatic reservation upon selection by the State and the latter did not. As Representative McRae explained, 26 Cong. Rec. 8391 (1894): "The Senate proposition makes a reservation outright for the States and will make it possible for the States to put a million of acres in each State in reservation for an indefinite period. . . . The pending proposition does not make any grant, but only authorizes the Secretary of the Interior with the approval of the President to make a contract with any States in which any of these lands may be situated. . . ." And again, *id.*, at 8431: "This is no grant at all, but only gives authority to the Secretary of the Interior and President to make contracts binding the United States to donate the land to the States when reclaimed." There are some indications during the debates, originating from both proponents and opponents of the provision, that perhaps a more substantive action was intended; but there is nothing that undercuts the explanation of Representative McRae as to the meaning of the markedly different language contained in the House substitute. Nor is there anything persuasive in the several later additions or amendments to the Carey Act to indicate that the Act reserved to the States or obligated the Secretary to contract for any particular acreage for Carey Act development.[9]

---

[9] In 1896, Congress provided that patents could be issued when water had been supplied to the land without regard to settlement or cultivation. The same Act provided for liens against the lands prior to patent for the costs of reclamation. Act of June 11, 1896, § 1, 29 Stat. 434, 43 U. S. C. § 642. Although § 642 refers to the "grant" made under § 641, the context indicates that the word is loosely used to refer to the state laws enacted in acceptance of the terms of the Carey Act. Idaho, in fact, stresses that it, like 9 of the 11 other desert land States, specifically referred to the Carey Act's "grants of land" when the State enacted legislative acceptances of the offer to obtain federal lands by reclamation. Brief for Respondents 12–13, and n. 6.

Subsequent legislation did not touch on the issue at all. In 1908, an

It has also been the consistent view of the Department of the Interior that the Carey Act does not grant or reserve any specified acreage of desert lands for development under the Carey Act. *State of Wyoming,* 36 L. D. 399 (1908), relied on by the Secretary in this case, stands for at least this much; and we have in other cases accorded a considerable deference to the responsible agency's construction of the statute which it administers. *Andrus* v. *Charlestone Stone Products Co.,* 436 U. S. 604, 613–614 (1978); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965); *Cameron* v. *United States,* 252 U. S. 450, 460 (1920). It is also ascertainable from the Congressional Record, reflecting the proceedings connected with the 1908 amendments to the Carey Act, that the eight States covered by the Act had by that time selected approximately 2.72 million acres under the Carey Act but that less than half that amount, 1.12 million acres, had been approved and only 200,000 acres had gone to patent. One of the many reasons for rejections of selected lands had been that they

---

additional two million acres of desert lands were authorized for Carey Act selection in the State of Idaho, 43 U. S. C. § 645 and Joint Res. 28, 60th Cong., 1st Sess. (1908), see 35 Stat. 577; and an additional one million acres in the State of Wyoming. 43 U. S. C. § 645. In 1909, the provisions of the Carey Act were extended to the States of Arizona and New Mexico, § 646, and to the former Ute Indian Reservation in Colorado. § 647. In 1910, as indicated in the text, § 643 with respect to temporary withdrawals was adopted. In 1911, the Act was extended to the Fort Bridger Military Reservation in Wyoming, Act of Feb. 16, 1911, ch. 90, 36 Stat. 913; and an additional one million acres were authorized for the States of Nevada and Colorado. 43 U. S. C. § 645. The Act was amended in 1920 with respect to rights of entry by settlers on lands covered by unsuccessful Carey Act projects. § 644. In 1921, the Secretary of the Interior was authorized to extend the period of segregation or to restore the lands to the public domain when States failed to construct the anticipated reclamation works. § 641. Congress at no time indicated disagreement with the way that the Secretary was administering the Carey Act, at least as relevant to the issues in this case.

were already in other legitimate use or that such use was being considered. 42 Cong. Rec. 6437 (1908).[10]

Against this background, we conclude that Congress did not intend to reserve any specific number of acres of desert land for any State under the Carey Act and that the Act does not prevent the Secretary from committing otherwise available parts of the public domain for any of the uses authorized under the various statutes relating to the use and management of the public lands, such as the Taylor Grazing Act under which part of the lands that Idaho sought in this case have been withdrawn. It is also clear that one of the reasons prompting the McRae substitute was to eliminate the right of the State under the Senate version to have automatically reserved, and to contract for the particular lands that it selected. As finally adopted, the Act does not oblige the Secretary automatically to contract for lands chosen by the State even if its application otherwise conforms to the statute. Hence, even though a State's selection has not been withdrawn for other uses, as is the case with part of the land that Idaho applied for in this case,[11] the Secretary need not always approve the application.[12]

---

[10] During the discussion, Representative Gaines of Tennessee asked Representative French of Idaho to explain why the Secretary had not granted all Carey Act applications. Representative French replied:

"The reason is this: We have a national reclamation law under which lands are being reclaimed; we have the Indian reservation law; we have lands that have passed into private ownership under the desert-land act and other laws. Sometimes it happens that an application for segregation under the Carey Act overlaps one or more of these propositions or tracts of land."

[11] Prior to the District Court's judgment, the Board also ruled on two other Carey Act applications by Idaho covering unwithdrawn and otherwise available land. *Idaho Department of Water Resources,* 25 I. B. L. A. 27 (1976); *Idaho Department of Water Resources,* 24 I. B. L. A. 314 (1976).

[12] The Secretary has not questioned the judgment and opinion of the District Court indicating that the Secretary's refusal to reclassify with-

The District Court was therefore correct in remitting the State to a reclassification proceeding with respect to the land in use as a stock driveway; but the District Court erred in declaring that the Act entitled the State to the statutory acreage in the sense that the Secretary was firmly bound to reserve such acreage and to contract for it as and when the State selected it.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed in part and reversed in part.

*So ordered.*

MR. JUSTICE STEVENS, dissenting.

Everyone agrees that the District Court correctly rejected Idaho's now-abandoned claim that the Carey Act, as amended, constituted an absolute, present grant of entitlement to any three million acres of arid lands that the State might designate at some time in the future. But the District Court's rejection of that claim did not require it to express any opinion on any of the questions that the Court discusses today.

This record does not present the question of what reasons, if any, are necessary or sufficient to justify a denial by the Secretary of a Carey Act application or a petition for reclassification under the Taylor Grazing Act.[1] I would therefore express no opinion on that question.

drawn lands for Carey Act purposes would be subject to judicial review and would be set aside if arbitrary or capricious. Neither has the Secretary asserted that his rejection of a State's application for withdrawal or segregation of appropriate desert lands in the public domain would not be subject to judicial review under the Administrative Procedure Act, 5 U. S. C. § 706. To the extent that the claim of absolute discretion to approve or disapprove Carey Act applications is inconsistent with. the absence of a direct challenge to this aspect of the District Court's decision or with the general standards for judicial review of agency action under the Administrative Procedure Act, we reject, as did the District Court, the claim of absolute discretion.

[1] Idaho's complaint prayed simply for a declaration that "the State of Idaho has an absolute right to demand up to three million acres of desert

Nor is there anything in this record to suggest that there is any imminent likelihood that the Secretary will reserve for other purposes so much of the federal land in Idaho otherwise suitable for Carey Act contracts that less than 2.4 million acres will be available.[2] Unless and until such a likelihood appears, there is no need to decide whether he may do so. The fact that in the 85-year life of the Carey Act Idaho has used only about one-fifth of the three million acres authorized makes it rather clear that resolution of that issue is of no immediate consequence to either party.

In short, I do not believe either of the questions on which the Court has volunteered its advice is ripe for decision. I would simply vacate the purely advisory portions of the District Court's judgment and refrain from deciding any questions not fairly raised by this record.

---

lands under the Carey Act and further . . . that the [Secretary of the Interior] . . . has no authority or discretion to deny any request for segregation or withdrawal when presented by the Plaintiff." App. 6.

[2] It was suggested by the State at oral argument that perhaps as much as 8.5 million acres is "susceptible of possible irrigation that is still in Federal hands." Tr. of Oral Arg. 31. To date, Idaho has received approximately 600,000 acres under the Carey Act.