**STATE OF NEVADA ex rel. NEVADA STATE BOARD OF AGRICULTURE, Plaintiff,**

**v.**

**UNITED STATES of America et al., Defendants.**

**No. CIV–R–78–77–ECR.**

United States District Court,
D. Nevada.

April 1, 1981.

Richard H. Bryan, Atty. Gen., Larry D. Struve, Chief Deputy Atty. Gen., Harry W. Swainston, Deputy Atty. Gen., Carson City, Nev., for plaintiff.

B. Mahlon Brown, U. S. Atty., By Samuel Coon, Asst. U. S. Atty., Reno, Nev., for defendants.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

The defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Amend-

ed Complaint for failure to state a claim upon which relief can be granted. A hearing was held on September 8, 1980, the plaintiff being represented by Deputy Attorney General Harry W. Swainston and the defendants by Assistant U.S. Attorney Shirley Smith. At the Court's request, supplemental points and authorities have been submitted by both sides.

This litigation commenced with the filing of a Complaint for Mandamus, Injunctive and Declaratory Relief, on April 25, 1978. It alleged that on June 4, 1964, the then Secretary of the Interior of the United States, Stewart L. Udall, had published in the Federal Register an order which placed a moratorium upon consideration of applications for agricultural entries within the State of Nevada under the Homestead and Desert Land Acts. The Complaint asserted that the defendants had refused even to process applications since June 4, 1964. It is contended that the moratorium constituted invidious discrimination against Nevadans. Further, the plaintiff alleged that its Tenth Amendment rights were interfered with by reason of the defendants' policy of perpetual retention of public lands, when the law requires disposal of those lands by the United States.

The defendants responded to the Complaint with a Fed.R.Civ.P. 12 motion to dismiss on the ground the Court lacked subject matter jurisdiction. Their moving papers contended that the plaintiff State of Nevada had no standing, as proprietor, sovereign or parens patriae, to assert rights to public lands belonging to the United States.

The motion to dismiss was denied by U.S. District Judge Bruce R. Thompson, to whom the case was assigned at the time. His order declared that the State has standing to sue both in its sovereign capacity and as parens patriae.

On December 14, 1978, Secretary of the Interior Cecil D. Andrus rescinded the moratorium order of June 4, 1964. The plaintiff State, with leave of Court, then filed an Amended Complaint for Mandamus, Injunctive and Declaratory Relief. This is the pleading that is the subject of the instant motion to dismiss. It contends that the United States holds Nevada's public lands in trust temporarily, for the purpose of disposal to the State and its citizens. The plaintiff alleges that Nevada was admitted into the Union on an "equal footing" with the original thirteen states, which had ceded their unappropriated lands to the federal government with the understanding they would be sold for the benefit of the people of all the states. The Amended Complaint further alleges that The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 et seq. (hereinafter referred to as FLPMA), unconstitutionally infringes upon Nevada's Tenth Amendment and "equal footing" rights by declaring a new and different policy that public lands shall be retained in federal ownership unless, as a result of the comprehensive land use planning procedure provided for in the FLPMA, ". . . it is determined that disposal of a particular parcel will serve the national interest . . . ." 43 U.S.C. § 1701(a)(1). The State also asks for a declaratory judgment adjudicating whether the defendants may constitutionally impose a moratorium on the disposal of public lands and whether the United States "may maintain a policy of permanent and perpetual retention of the public lands."

Although the motion to dismiss is based primarily on the Amended Complaint's failure to state a claim upon which relief can be granted, certain other issues also have been briefed and argued at the Court's request.

*Jurisdiction* :

The Amended Complaint alleges a half dozen statutory bases for jurisdiction. 5 U.S.C. § 702, a part of the Administrative Procedure Act, is applicable here. It provides for a waiver of sovereign immunity and for judicial review of agency action in a legal action for relief other than money damages, where it is alleged that a federal agency or officer failed to act as required in an official capacity. *Rowe v. United States*, 633 F.2d 799 (9th Cir. 1980); see also, *Ness Inv. Corp. v. United States Dept. of Agr., Forest S.*, 512 F.2d 706 (9th Cir.

1975); *County of Trinity v. Andrus*, 438 F.Supp. 1368 (E.D.Cal.1977). Further, the FLPMA itself states that it is federal policy that "judicial review of public land adjudication decisions be provided by law." 43 U.S.C. § 1701(a)(6); *see also, Perkins v. Bergland*, 608 F.2d 803 (9th Cir. 1979); *Valdez v. Applegate*, 616 F.2d 570 (10th Cir. 1980).

*Standing*:

■ A state agency with responsibilities related to issues it seeks to litigate is a proper plaintiff to obtain review of an administrative order. *Washington Utilities & Transp. Com'n v. F.C.C.*, 513 F.2d 1142 (9th Cir. 1975). A private citizen has no enforceable right in public lands. *United States v. Midwest Oil Co.*, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). Therefore it is appropriate that a State has standing to sue when its sovereign and quasi-sovereign interests are implicated and it is not merely litigating, as a volunteer, the personal claims of its citizens. *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976). The State of Nevada, ex rel. the Nevada State Board of Agriculture, has standing to bring and prosecute this action.

*Case or Controversy*:

The defendants have argued vigorously that no case or controversy is before the Court, in that there is no concrete controversy admitting of specific relief that can be judicially molded, but merely a political question.

In *Andrus v. Idaho*, 445 U.S. 715, 100 S.Ct. 1450, 63 L.Ed.2d 739 (1980), the State of Idaho sought a judgment declaring that it had an absolute right to demand some 2.4 million acres of public lands within its borders under the Carey Act, which dealt with the irrigation and reclamation of desert lands. The Secretary of Interior contended that said Act did not obligate him to contract with Idaho, but merely authorized him to contract if, in his discretion, he saw fit to do so.

The U.S. Supreme Court found that there had been a case or controversy, involving the State's rights under the Carey Act, before the district court. It amounted to a review of the Secretary's action and a declaration of the respective rights of the parties under the Act. The similarity to the instant action is apparent.

*Mootness*:

■ The recission of the moratorium in 1978 rendered this action moot, in the view of the defendants. However, the constitutionality of the FLPMA is also before the Court, insofar as the new policy to retain the land in federal ownership is concerned. Where one of several issues presented has become moot, the remaining issues supply the constitutional requirement of a case or controversy. *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973). This is so even when the remaining issue is to be resolved by a declaratory judgment. *Id.*

■ In any event, voluntary cessation of allegedly illegal conduct does not make a case moot where there is a dispute over the legality of the challenged practices and the defendant is free to return to his old ways. *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *see also, County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). "It is sufficient, therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 125–126, 94 S.Ct. 1694, 1699–1700, 40 L.Ed.2d 1 (1974).

■ The Court therefore agrees with Judge Thompson that it has jurisdiction to decide this case on the merits, and this is so even though the moratorium regulation has been rescinded.

The position of the plaintiff *vis a vis* the motion to dismiss has been stated clearly in a memorandum of points and authorities filed herein on October 8, 1980:

"In summary, the State's arguments advanced against the defendants' motion to dismiss have been as follows: The State contends that she and all of the public land states had an expectancy upon admission into the Union that the unappropriated, unreserved and vacant lands within their borders would be disposed of by patents to private individuals or by grants to the States. This expectancy was supported by two legal theories: First, that the United States held the public lands in trust, the conditions of which were established by the early deeds of cessions by which certain of the original states ceded their western lands and by subsequent treaties and understandings associated with later acquisitions of territory now a part of the United States; disposal was one of the conditions. Second, that the new states would not be in an equal footing until the disposal contemplated by the deeds of cession and the temporary land holding trusts was accomplished; and that equal footing is a constitutional condition of all of the states of the Union."

*Pollard's Lessee v. Hagan* :

The keystone of the State of Nevada's argument is the case of *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). It declares that the United States never held any rights to the vacant lands in any of the new states (Alabama was there involved) except temporarily to execute the trusts created by the original states in their deeds of cession of their western lands to the federal government. "Both of these deeds of cession stipulated, that all the lands within .the territory ceded, and not reserved or appropriated to other purposes, should be considered as a common fund for the use and benefit of all the United States, to be faithfully and *bona fide* disposed of for that purpose, and for no other use or purpose whatever." *Id.,* at 221.

The opinion also points out that Congress, in 1787, specified that new states shall be admitted into the Union " . . . on an equal footing with the original states in all respects whatever." *Id.,* at 222.

The purpose of the cessions of unappropriated lands to the federal government was for the land to be sold, and the proceeds applied to paying the public debt incurred in the Revolutionary War.

"The object of all the parties to these contracts of cession, was to convert the land into money for the payment of the debt and to erect new states over the territory thus ceded; and as soon as these purposes could be accomplished, the power of the United States over these lands, as property, was to cease.

"Whenever the United States shall have fully executed these trusts, the municipal sovereignty of the new states will be complete, throughout their respective borders, and they, and the original states, will be upon an equal footing, in all respects whatever." *Id.,* at 223.

*Pollard's Lessee* discusses the agreement by the legislatures of territories seeking admission into the Union that they disclaim all right and title to the unappropriated lands lying within their respective territories. (Section 4 of the Nevada Admission Act [1864], found in Volume 29 of Nevada Revised Statutes, contains such a provision.) It states that such an agreement, in combination with the Property Clause of the U.S. Constitution (Art. 4, § 3, cl. 2) which reads that Congress is given the power to make all needful rules and regulations respecting the territory or other property belonging to the United States, results merely in the federal government having the right to pass laws protecting public lands from taxation and providing for their sale.

The case involved a city lot in Mobile, Alabama, which, at the time Alabama was admitted to the Union, was covered by waters of the Mobile River at high tide. The plaintiffs claimed under a patent from the United States issued pursuant to an act of Congress. The defendants argued that the lot never belonged to the United States, so that it had no right to convey it. The Court held in favor of the defendants. It states its conclusions on pages 259–260:

First, The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states. Thirdly, The right of the United States to the public lands, and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy in this case."

*"Equal Footing" Doctrine* :

Unfortunately for the plaintiff herein, the U.S. Supreme Court has greatly weakened the *Pollard's Lessee* case as precedent supportive of the plaintiff's arguments. In *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), said Court discussed the reasons for insertion of the Property Clause in the Constitution. The federal government was to be one of carefully limited powers, and it had no grant of authority to receive and administer the unappropriated lands and other properties, such as military equipment and supplies, which the thirteen original sovereign states wished to cede to it for the common good. The raising of money to pay the public debt by selling the lands was the main object of the cessions. The Property Clause provided the United States Government with the power to take possession of the properties and protect them, so that they could be disposed of in an orderly fashion. "It applied only to the property which the States held in common at that time, and has no reference whatever to any territory or other property which the new sovereignty might afterwards itself acquire." *Id.*, at 436. To the same effect is the opinion in *United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 10 L.Ed. 573 (1840), which declares that the limitations on what the federal government can do with its property, by reason of the origin of the Property Clause, apply only to lands within the original thirteen states; there are no such limitations on territory subsequently acquired by the federal government by treaty or conquest.

Thus, it can be seen that the trust (to sell the public lands) found in *Pollard's Lessee* would not apply to such lands owned by the United States within the borders of Nevada.

In addition, the U.S. Supreme Court has stated that *Pollard's Lessee* involved only the shores of and lands beneath navigable waters. *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). As a result, its broad discussions seemingly covering unappropriated lands could be dismissed as dicta.

■ Federal regulation which is otherwise valid is not a violation of the "equal footing" doctrine merely because its impact may differ between various states because of geographic or economic reasons. *Island Airlines, Incorporated v. C.A.B.*, 363 F.2d 120 (9th Cir. 1966). The doctrine applies only to political rights and sovereignty; it does not cover economic matters, for there never has been equality among the states in that sense. *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). Said case points out that, when they entered the Union, some states contained large tracts of land belonging to the federal government, whereas others had none. "The requirement of equal footing was designed not to wipe out these diversities but to create parity as respects political standing and sovereignty." *Id.*, at 716, 70 S.Ct. at 922. Accordingly, Congress may cede property to one state without a corresponding cession to all states. Concurring op. of Reed, J., in *Alabama v. Texas*, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954). The equal footing doctrine does not affect Congress' power to dispose of federal property. *Ibid.*

*Federal Power over Public Lands* :

■ The public domain passes to the United States upon the admission of a state to the Union; this is implicit in the acts of admission. *Clackamas County, Oregon v. McKay*, 226 F.2d 343 (D.C.Cir.1955). Regulations dealing with the care and disposition of public lands within the boundaries of a

new state may properly be embraced in its act of admission, as within the sphere of the plain power of Congress. *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). No state legislation may interfere with Congress' power over the public domain; to prevent any attempt at interference, the act of admission usually contains an agreement by the state not to interfere. *Gibson v. Chouteau,* 80 U.S. (13 Wall.) 92, 20 L.Ed. 534 (1871); *Van Brocklin v. State of Tennessee,* 117 U.S. 151, 6 S.Ct. 670, 29 L.Ed. 845 (1886). Nevada was admitted to the Union subject to such an agreement. 13 U.S.Stats. at Large 31; Act of Congress (1864) Enabling the People of Nevada to Form a Constitution and State Government, at sec. 4 thereof, found in Volume 29 of Nevada Revised Statutes.

 Art. 4, § 3, Cl. 2 of the Constitution ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other property belonging to the United States . . . .") entrusts Congress with power over the public land without limitations; it is not for the courts to say how that trust shall be administered, but for Congress to determine. *United States v. San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); *Alabama v. Texas, supra; Ivanhoe Irrig. Dist. v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). Necessarily, then, the U.S. Government may sell public land or withhold it from sale. *Light v. United States,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897). Thus, the consent of the state is not required for Congress to withdraw large bodies of land from settlement. *Light v. United States,* supra. That a power may be injuriously exercised is no reason for a misconstruction of the scope and extent of that power. *Stearns v. Minnesota,* 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900).

The responsibility of Congress to utilize the country's assets in a way that it decides is best for the future of the nation is a sort of trust, but not in the sense that a private trustee holds for the benefit of the trust's beneficiaries. *Alabama v. Texas, supra; see also, Sierra Club v. Andrus,* 487 F.Supp. 443 (D.D.C.1980).

■ It appearing beyond doubt that the plaintiff can prove no set of facts which would entitle it to judicial relief, the defendants' motion to dismiss for failure to state a claim upon which relief can be granted, must be granted.

The Clerk of the Court shall enter judgment in favor of defendants and against plaintiff, dismissing the action.